[Crim. No. 11572. In Bank. Nov. 18, 1968.]

In re ROBERT PAGE ANDERSON on Habeas Corpus.

[Crim. No 11573. In Bank. Nov. 18, 1968.]

In re FREDERICK SATERFIELD on Habeas Corpus.

(Two Cases.)

Marshall W. Krause, Richard Bancroft, Garfield Stewart, Jack Greenberg, Leroy D. Clark, Charles S. Ralston, Nathaniel Colley, Anthony G. Amsterdam, Jerome B. Falk, Jr., Gary D. Berger, Roy Eisenhardt, Harry J. Kreamer, Paul N. Halvonik, Michael Meltsner, Melvyn Zarr, Jack Himmelstein and Nathaniel Colley for Petitioners.

Kenneth M. Wells, Gerald H. Gottlieb, Earl Klein, Eric A. Rose, Charles E. Voltz, Kenneth W. Graham, Jr., Carl B. Shapiro, Hubert C. Cavanagh, Frank G. Prantil, Herbert E. Selwyn, A. L. Wirin, Fred Okrand, Francis Heisler, Richard A. Ibañez, James Weinberg, Morris Lavine, Robert L. Fitzpatrick, Michael E. Smith and Herman F. Selvin as Amici Curiae on behalf of Petitioners.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Edward P. O'Brien, Robert R. Granucci and George R. Nock, Deputy Attorneys General, for Respondent.

BURKE, J.—The issue here presented is whether the death penalty and the procedures followed in imposing it are constitutional, and not whether it should be retained or abolished in California. Retention or abolition raises a question of legislative policy which under our system of division of powers falls within the competence of the Legislature or the electorate.

A jury found Frederick Saterfield guilty on two counts of first degree murder and fixed the penalty on each count at death; the judgment was affirmed (*People* v. *Saterfield*, 65 Cal.2d 752 [56 Cal.Rptr. 338, 423 P.2d 266] [cert. den. 389 U.S. 942 and 964 [19 L.Ed.2d 378, 88 S.Ct. 352]]). A jury also found Robert Page Anderson guilty of first degree murder, attempted murder of three other men, and first degree robbery, and fixed the penalty at death for the murder; the judgment was affirmed (*People* v. *Anderson*, 64 Cal.2d 633 [51 Cal.Rptr. 238, 414 P.2d 366]).

Saterfield and Anderson now seek habeas corpus on the grounds that (1) it was improper to excuse for cause veniremen conscientiously opposed to the death penalty; (2) Penal Code sections 190 and 190.1 are unconstitutional because they contain no standards to assist the trier of fact in determining whether to impose death or life imprisonment; (3) the death penalty per se and as applied, constitutes cruel and unusual punishment; and (4) petitioners have been denied their right to counsel in post-state-appeal proceedings. We issued orders to show cause and pending final determination of the instant proceedings stayed all judgments of death in California. Counsel in all pending automatic appeals and other attorneys were afforded an opportunity to file amicus curiae briefs, in which additional arguments have been presented challenging the constitutionality of the death penalty as applied in California.

We hold that the death penalty is constitutional and does not constitute cruel or unusual punishment, that Penal Code sections 190 and 190.1 are valid, and that in keeping with a newly declared policy of this court petitioners, and all other indigent defendants in capital cases, in the interests of justice, will be afforded the services of counsel in the proceedings hereafter specified between the termination of their state appeals and their execution. We have further concluded that under the compulsion of the June 3, 1968, decision of the United States Supreme Court in *Witherspoon* v. *Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 770], the death penalties in the two cases now before us must be set aside because certain prospective jurors were improperly excused for cause. It is necessary, therefore, that petitioners be remanded to the trial courts for new trials limited to the issue of penalty.

*Excusing Veniremen Opposed To Death Penalty*

Petitioners argue that excusing for cause veniremen conscientiously opposed to the death penalty deprived them of a jury which fairly represented a cross section of the community and tended to assure the state a jury whose members were favorable to the prosecution at each phase of the trial. At Saterfield's trial two prospective jurors and two prospective alternate jurors were excused for cause on the ground of their opposition to the death penalty. Likewise at Anderson's trial seven prospective jurors and one prospective alternate juror were excused for cause on that same ground.

At each trial one or more of the prospective jurors excused on that ground did not make it ''unmistakably clear (1) that [he] would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial . . . or (2) that [his] attitude toward the death penalty would prevent [him] from making an impartial decision as to the defendant's *guilt,''* as mandated by the *Witherspoon* decision. (391 U.S. 510, 522-523, fn. 21 [20 L.Ed.2d 776, 785].) For example, at Saterfield's trial one prospective juror stated, ''I am opposed to the death penalty,'' and was thereupon excused for cause; at Anderson's trial one prospective juror in response to the question ''Do you know of any reason you couldn't be a fair and impartial juror in this case?'' replied, ''Yes, sir, I do. I don't believe in capital punishment'' and was immediately excused for cause. In neither instance had the court made it clear to that particular prospective juror that opposition to the death pen-

alty or conscientious scruples against that penalty would be insufficient by itself to disqualify such a juror from serving. ■■■■ This is not surprising, because the trials preceded the decision of the United States Supreme Court in *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, which sets forth new rules that the states are not only compelled to follow but must apply retroactively (see fn. 22, at p. 523 [20 L.Ed.2d at p. 785]).

*Witherspoon* held "that a sentence of death can not be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon* further stated that "No defendant can constitutionally be put to death at the hands of a tribunal so selected" but that "nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*"

■■■■ *Witherspoon,* therefore, requires us to set aside the death penalties imposed on petitioners and to have the issue of penalty retried. There is no merit to the Attorney General's contention that, since, assertedly, the California law at the time of petitioners' trials was not materially different from the rules in *Witherspoon,* defense counsels' failure to object to the exclusion of the prospective jurors in question bars petitioners from now claiming error. At the time of petitioners' trials, under decisions interpreting Penal Code section 1074, subdivision 8, it was proper to excuse for cause prospective jurors who "did not believe in capital punishment" or who were "conscientiously opposed to capital punishment" as well as those "whose consciences would preclude them from imposing [the death penalty]." (E.g., *People* v. *Shipp,* 59 Cal.2d 845, 853 [31 Cal.Rptr. 457, 382 P.2d 577] [cert. den. 377 U.S. 999 [12 L.Ed.2d 1049, 84 S.Ct. 1927]]; *People* v. *Love,* 56 Cal.2d 720, 726 [16 Cal.Rptr. 777, 17 Cal. Rptr. 481, 366 P.2d 33, 809]; *People* v. *Duncan,* 53 Cal.2d 803, 816 [3 Cal.Rptr. 351, 350 P.2d 103] [pet. for cert. granted, 363 U.S. 840 [4 L.Ed.2d 1725, 80 S.Ct. 1639]; writ

dismissed 366 U.S. 417 [6 L.Ed.2d 380, 81 S.Ct. 1355]]; *People* v. *Wein,* 50 Cal.2d 383, 394 [326 P.2d 457] [cert. den. 358 U.S. 866 [3 L.Ed.2d 99, 79 S.Ct. 98]]; *People* v. *Riser,* 47 Cal.2d 566, 573-576 [305 P.2d 1] [app. dism. 358 U.S. 646 [3 L.Ed.2d 568, 79 S.Ct. 537]]; *People* v. *Hoyt,* 20 Cal.2d 306, 316 [125 P.2d 29]; *People* v. *Kynette,* 15 Cal.2d 731, 744-745 [104 P.2d 794] [cert. den. 312 U.S. 703 [85 L.Ed.2d 1136, 61 S.Ct. 806]]; see *People* v. *Carter,* 56 Cal.2d 549, 573, fn. 10 [15 Cal.Rptr. 645, 364 P.2d 477].) It is obvious that *Witherspoon* made a material change in the law in this state. Since petitioners were tried before *Witherspoon,* failure to object to the exclusion of the prospective jurors in question does not bar petitioners from now claiming error. (Cf. *People* v. *Nye,* 63 Cal.2d 166, 175 [45 Cal.Rptr. 328, 403 P.2d 736]; *People* v. *Love, supra,* 56 Cal.2d 720, 731-732; *People* v. *Kitchens,* 46 Cal.2d 260, 262-263 [294 P.2d 17].)

The Attorney General also contends that any error under *Witherspoon* in excusing for cause prospective jurors opposed to the death penalty is nonprejudicial where, as here, the prosecution had sufficient peremptory challenges to remove all such jurors. The Attorney General asserts that since the chances of a jury's being able to determine the penalty impartially are diminished if the jury contains even one person who is hostile to, or has reservations concerning, the death penalty, it may be assumed that, if the challenges for cause had not been available, the prosecutors would have excluded the veniremen in question by way of peremptory challenge; that a prosecutor may constitutionally exercise his peremptory challenges in a particular case for any purpose he deems proper (*Swain* v. *Alabama,* 380 U.S. 202, 221-222 [13 L.Ed.2d 759, 773-774, 85 S.Ct. 824]); and that therefore any error in excluding for cause the veniremen in question did not affect the composition of the juries at petitioners' trials and is not a ground for vacating the death sentences.

 We do not agree. *Witherspoon* did not discuss the effect of the existence of remaining peremptory challenges of the prosecution, but the broad language of the opinion establishes without doubt that in no case can a defendant be put to death where a venireman was excused for cause solely on the ground he was conscientiously opposed to the death penalty. According to our understanding of *Witherspoon,* reversal is automatically required if a venireman was improperly excused for cause on the basis of his opposition to the death penalty. It may be noted that in *Witherspoon* the *defense* had

three remaining peremptory challenges when it accepted the jury, but that fact was not viewed as showing that the jurors who were impaneled were impartial and that therefore no harm resulted from improperly excusing for cause some prospective jurors. Furthermore, in arguing that it may be assumed that the prosecutor would have used his peremptory · challenges to remove veniremen who under *Witherspoon* were improperly excused for cause, the Attorney General bases his argument on a concept of an impartial jury that is in conflict with the majority opinion in *Witherspoon*. Under the view of the *Witherspoon* majority a jury from which all prospective jurors opposed the death penalty have been excluded is not an impartial jury but rather constitutes a "hanging jury," one that is "uncommonly willing to condemn a man to die," and one that "cannot speak for the community" but "can speak only for a distinct and dwindling minority." We cannot engage in conjecture that the prosecutor would have used his peremptory challenges to excuse all such jurors.

■ *Witherspoon* left undecided the question whether the exclusion of veniremen opposed to capital punishment necessitates setting aside the judgment as to guilt. The opinion noted (fn. 11, p. 517 [20 L.Ed.2d at p. 782]) that during the post-conviction proceedings there under review no request was made to submit evidence on the matter. The petitioner in that case pointed to certain materials, but the United States Supreme Court stated, "We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction."[1]

---

[1] *Witherspoon* further declared (fn. 18, p. 520 [20 L.Ed.2d at p. 784]), that "in some future case" a defendant convicted by a jury from which the state had excluded only those prospective jurors who stated that they would not even consider returning a death penalty "might still attempt · to establish that the jury was less than neutral with respect to *guilt*. If he were to succeed in that effort, the question would then arise whether the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest in a completely fair determination of guilt or innocence—given the possibility of accommodating both interests by means of a bifurcated trial, using one jury to decide guilt and another to fix punishment."

In *Witherspoon* one of the three dissenting justices similarly stated (fn. 1, p. 541 [20 L.Ed.2d at p. 795]), "I would not wholly foreclose the possibility of a showing that certain restrictions on jury membership imposed because of jury participation in penalty determination produce a jury which is not constitutionally constituted for the purpose of determining guilt."

In the instant case petitioners made a motion for an evidentiary hearing regarding their claim that the exclusion of veniremen opposed to capital punishment results in an unrepresentative jury on the issue of guilt and substantially increases the risk of conviction. We denied the motion in December 1967. Petitioners have again requested such a hearing and ask that we reconsider the matter in the light of *Witherspoon*. They state that they have arranged with Louis Harris and Associates to conduct a described study and that the result of this study "is suggestive of the kind of factual inquiry whose product can be presented at an evidentiary hearing." They further state that the Harris study has not yet been finished and that preparation for an evidentiary hearing will require "several more months—at the least." What was stated by the New Jersey Supreme Court in response to a request for the same type of evidentiary hearing is applicable, namely, ". . . we cannot suspend the judicial process until projected studies are made at the behest of a litigant. This is especially true when the studies are of a sociological or psychological nature, for the prospect is remote that such studies will yield views of human behavior of such incontestable, eternal truth that existing constitutional doctrines will have to retreat before them. Such studies hold too little promise to warrant what would amount to an indeterminate stay of the judicial process in a critical area." (*State of New Jersey* v. *Forcella* (July 1968) 52 N.J. 263 [245 A.2d 181].) It is thus unnecessary to consider at this time various arguments of the Attorney General in support of his position that petitioners are not entitled to an evidentiary hearing.

*Penalty Discretion: Standards*

Petitioners further contend that Penal Code sections 190 and 190.1 violate the due process and equal protection clauses of the United States Constitution because those sections, allegedly without specifying any standards, impose on the trier of fact the duty of selecting the penalty. It is asserted that the absence of standards prevents a defendant from knowing how to defend himself at the penalty trial, permits the trier of fact to impose the death penalty for arbitrary reasons, and precludes a meaningful review of the penalty imposed.

Section 190, as enacted in 1872, specified the death penalty as the sole punishment for first degree murder. By the amendments of 1873-1874, the section vested in the trier of fact discretion to fix the penalty at death or life imprisonment,

and from that time to the present date no amendments to the section have modified or limited in any way the absolute discretion of the trier of fact to determine which of the two penalties to impose.[2] Section 190.1, as enacted in 1957 and amended in 1959, likewise does not limit that discretion.

This court has held repeatedly that under sections 190 and 190.1 the Legislature has entrusted to the absolute discretion of the trier of fact the awesome decision between life imprisonment and death for first degree murder (e.g. *People* v. *Polk,* 63 Cal.2d 443, 454 [47 Cal.Rptr. 1, 406 P.2d 641] [cert. den. 384 U.S. 1010 [16 L.Ed.2d 1016, 86 S.Ct. 1914]]; *People* v. *Hines,* 61 Cal.2d 164, 168-169 [37 Cal.Rptr. 622, 390 P.2d 398]; *People* v. *Purvis,* 56 Cal.2d 93, 96 [13 Cal.Rptr. 801, 362 P.2d 713]; *People* v. *Brice,* 49 Cal.2d 434, 437 [317 P.2d 961]; *People* v. *Green,* 47 Cal.2d 209, 218 [302 P.2d 307]), and that the law does not prescribe or authorize the court to innovate any rule circumscribing the exercise of that discretion—that the jury need not find ameliorating circumstances to impose life imprisonment, nor need they find aggravating circumstances to impose death (e.g. *People* v. *Hamilton,* 60 Cal.2d 105, 136 [32 Cal.Rptr. 4, 383 P.2d 412]; *People* v. *Lane,* 56 Cal.2d 773, 786 [16 Cal.Rptr. 801, 366 P.2d 57]; *People* v. *Green, supra,* 47 Cal.2d 209; *People* v. *Friend,* 47 Cal.2d 749, 767 [306 P.2d 463]). An instruction directing the jury to fix the penalty at death unless they found extenuating circumstances was held contrary to the statute and erroneous in *People* v. *Green, supra,* 47 Cal.2d 209, 217, which overruled

---

[2]Section 190 provides: ''Every person guilty of murder in the first degree shall suffer death, or confinement in the state prison for life, at the discretion of the court or jury trying the same, and the matter of punishment shall be determined as provided in Section 190.1, . . .'' (Amendments to the Codes, 1873-1874, p. 457; Stats. 1921, ch. 105, § 1, p. 98; Stats. 1927, ch. 889, § 1, p. 1952; Stats. 1957, ch. 1968, § 1, p. 3509.)

Section 190.1 provides: ''The guilt or innocence of every person charged with an offense for which the penalty is in the alternative death or imprisonment for life shall first be determined, without a finding as to penalty. If such person has been found guilty of an offense punishable by life imprisonment or death, and has been found sane on any plea of not guilty by reason of insanity, there shall thereupon be further proceedings on the issue of penalty, and the trier of fact shall fix the penalty. Evidence may be presented at the further proceedings on the issue of penalty, of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty. The determination of the penalty of life imprisonment or death shall be in the discretion of the court or jury trying the issue of fact on the evidence presented, and the penalty fixed shall be expressly stated in the decision or verdict. The death penalty shall not be imposed, however, upon any person who was under the age of 18 years at the time of the commission of the crime. . . .''

a line of cases originating with *People* v. *Welch* (1874) 49 Cal. 174, that approved such an instruction.

Although the jury has absolute discretion in determining which penalty to impose, safeguards exist to protect against any possibility of arbitrary action. In disposing of a defendant's motion for a new trial, the trial judge has the duty to review the evidence to determine whether in his independent judgment the weight of the evidence supports the jury's verdict, and if he decides it does not, he has the power to reduce the penalty to life imprisonment. (Pen. Code, § 1181, subd. 7; *People* v. *Hill*, 66 Cal.2d 536, 567-568 [58 Cal.Rptr. 340, 426 P.2d 908] [cert. den. 389 U.S. 993, and 390 U.S. 911 [19 L.Ed. 2d 884, 88 S.Ct. 838]]; *People* v. *Love, supra*, 56 Cal.2d 720, 727-729; *People* v. *Moore*, 53 Cal.2d 451, 454 [2 Cal.Rptr. 6, 348 P.2d 584].) In addition the Governor has the power to grant a pardon or commutation. (Cal. Const., art. V, § 13; Pen. Code, § 4800 et seq.) This court, however, has consistently and repeatedly held that it has no power to substitute its judgment as to choice of penalty for that of the trier of fact. (E.g. *People* v. *Lookadoo*, 66 Cal.2d 307, 327 [57 Cal.Rptr. 608, 425 P.2d 208]; *People* v. *Mitchell*, 63 Cal.2d 805, 821 [48 Cal.Rptr. 371, 409 P.2d 211] [cert. den. 384 U.S. 1007 [16 L.Ed.2d 1021, 86 S.Ct. 1985]]; *People* v. *Howk*, 56 Cal.2d 687, 699-701 [16 Cal. Rptr. 370, 365 P.2d 426];; *People* v. *Monk*, 56 Cal.2d 288, 300 [14 Cal.Rptr. 633, 363 P.2d 865]; *People* v. *Rittger*, 54 Cal.2d 720, 734-735 [7 Cal.Rptr. 901, 355 P.2d 645]; *People* v. *Cash*, 52 Cal.2d 841, 845 [345 P.2d 462]; *People* v. *Linden*, 52 Cal.2d 1, 26 [338 P.2d 397] [cert. den. 364 U.S. 849 [5 L.Ed.2d 73, 81 S.Ct. 94]]; *People* v. *Green, supra*, 47 Cal.2d 209, 235; *People* v. *Harrison*, 41 Cal.2d 216, 219 [258 P.2d 1016]; *People* v. *Dessauer*, 38 Cal.2d 547, 555 [241 P.2d 238] [cert. den. 344 U.S. 858 [97 L.Ed. 666, 73 S.Ct. 96]]; *People* v. *Thomas*, 37 Cal.2d 74, 77-78 [230 P.2d 351]; *People* v. *Odle*, 37 Cal.2d 52, 58 [230 P.2d 345]; *People* v. *Danielly*, 33 Cal.2d 362, 383 [202 P.2d 18] [cert. den. 337 U.S. 919 [93 L.Ed. 1728, 69 S.Ct. 1162]]; *People* v. *Tuthill*, 32 Cal.2d 819, 827 [198 P.2d 505].)

The constitutionality of sections 190 and 190.1, as construed by this court, has been upheld. Repeated previous attacks upon one or both of the sections on the ground that their failure to provide standards rendered them unconstitutional or impermissibly vague or a violation of due process consistently have been rejected. (E.g. *People* v. *Hill supra*, 66 Cal.2d 536, 568-569 [cert. den. 389 U.S. 993 and 390 U.S. 911 [19 L. Ed.2d 884, 88 S.Ct. 838]]; *People* v. *Seiterle*, 65 Cal.2d 333,

340 [54 Cal.Rptr. 745, 420 P.2d 217] [cert. den. 387 U.S. 912 [18 L.Ed.2d 633, 87 S.Ct. 1699]]; *People* v. *Mason,* 54 Cal.2d 164, 169 [4 Cal.Rptr. 841, 351 P.2d 1025].)[3]

In other jurisdictions courts have likewise rejected claims that due process or equal protection was violated by statutes vesting in the trier of fact unguided discretion in the choice between the penalties of death and life imprisonment. (*Maxwell* v. *Bishop,* 398 F.2d 138, 148-150; *In re Ernst's Petition,* 294 F.2d 556, 560-561 [cert. den. 368 U.S. 917 [7 L.Ed.2d 132, 82 S.Ct. 198]]; *State* v. *Walters,* 145 Conn. 60 [138 A.2d 786, 792-794] [app. dism. and cert. den. 358 U.S. 46 [3 L.Ed.2d 45, 79 S.Ct. 70]]; *State* v. *Latham,* 190 Kan. 411 [375 P.2d 788, 796-799] [cert. den. 373 U.S. 919 [10 L.Ed.2d 418, 83 S.Ct. 1310]]; *Chatterton* v. *Dutton,* 223 Ga. 243 [154 S.E.2d 213, 215] [cert. den. 389 U.S. 914 [19 L.Ed.2d 266, 88 S.Ct. 247]]; *State of New Jersey* v. *Forcella, supra,* 52 N.J. 263 [245 A.2d 181]; *State* v. *Johnson,* 34 N.J. 212 [168 A.2d 1, 10-11] [app. dism. "for want of a substantial federal question," 368 U.S. 145 [7 L.Ed.2d 188, 82 S.Ct. 247], cert. den. 368 U.S. 933 [7 L.Ed.2d 195, 82 S.Ct. 370]]; see also *Ex parte Sullivan,* 83 F.2d 796, 798.)

The statutes in *State* v. *Latham, supra,* and *Ex parte Sullivan, supra,* are similar in form to our sections 190 and 190.1. In the other out-of-state cases the statutes specify that the penalty for first degree murder shall be death unless the jury recommends life imprisonment. It has been suggested that this difference has constitutional significance because such statutes empower the jury to mitigate the death penalty whereas under our statutes the jury selects between two alternative penalties neither of which is given preference by the Legislature (see *People* v. *Green, supra,* 47 Cal.2d 209, 218). In effect, however, both forms confer unguided discretion upon the jury as to the choice of penalties and it would exalt form over substance to conclude that one violates due process and

---

[3]The suggestion that the previous decisions of this court assumed that constitutional doctrines applicable to statutes regulating conduct did not govern statutes prescribing penalties is devoid of merit. Not only in *Hill, Seiterle,* and *Mason,* but in other cases involving various constitutional attacks on penalty statutes we have not assumed constitutional doctrines were inapplicable but rather have held that the statutes complied with the Constitution and have rejected the attacks on their merits. (E.g., *People* v. *Turville,* 51 Cal.2d 620, 638 [335 P.2d 678]; *In re Watkins,* 64 Cal.2d 866, 869-870 [51 Cal.Rptr. 917, 415 P.2d 805].) Nor is reexamination of *Hill, Seiterle,* and *Mason* required by the statement in *Witherspoon* that "It should be understood that much more is involved here than a simple determination of sentence." Manifestly at the time of our cited cases we were fully aware of what was there involved.

equal protection and the other does not. As we shall see, in one sense both approaches serve to mitigate capital punishment, and both have been widely used throughout the United States (see American Law Institute, Model Penal Code Tentative Draft No. 9 (1959) p. 121-126; Knowlton, *Problems of Jury Discretion in Capital Cases* (1953) 101 U.Pa.L.Rev. 1099, 1101-1103).

Vesting in the trier of fact unguided discretion in the choice between penalties for first degree murder has long been characteristic of the laws of the United States and of many states. (See *In re Ernst's Petition, supra,* 294 F.2d 556, 560; see generally Knowlton, *Problems of Jury Discretion in Capital Cases, supra,* 101 U.Pa.L.Rev. 1099, 1101-1103.) ▇ The Legislature, by entrusting to the absolute discretion of the jury the decision between life imprisonment and death has indicated its belief that jurors understand the factors that are relevant to such a decision. (*People* v. *Polk, supra,* 63 Cal.2d 443, 451.)

It may be neither practicable nor desirable that any rigid formula control a trier of fact in determining whether to extend mercy by imposing life imprisonment or to deny it by imposing death. (See *In re Ernst's Petition, supra,* 294 F.2d 556, 560-561; *State* v. *Johnson, supra,* 168 A.2d 1, 10-11; Royal Commission on Capital Punishment 1949-1953 Report, pp. 173-174 and 195.) But even if it were practicable and desirable to have such a formula it does not follow that the Legislature's failure to provide one renders the sections unconstitutional.

A statute mitigating capital punishment is not essentially unfair to the wrongdoer for failure to specify standards for the exercise of that discretion. Sections 190 and 190.1, like the Federal Kidnaping Act which was involved in *United States* v. *Jackson,* 390 U.S. 570, 581-582 [20 L.Ed.2d 138, 147, 88 S.Ct. 1209],[4] have as an objective the avoidance of ''the more drastic alternative of mandatory capital punishment in every case. In this sense, the selective death penalty procedure established by the Federal Kidnaping Act [or California

---

[4] *United States* v. *Jackson, supra,* held unconstitutional the death penalty provision of the Federal Kidnaping Act, which permitted imposition of the death penalty only upon defendants who assert their right to be tried by a jury, reasoning that the effect of the provision was to needlessly penalize the assertion of the Fifth Amendment right to plead not guilty and the Sixth Amendment right to demand a jury trial. California Penal Code sections 190 and 190.1 do not contain this constitutional infirmity.

Penal Code sections 190 and 190.1] may be viewed as ameliorating the severity of the more extreme punishment that Congress [or the state Legislature] might have wished to provide.''

The discretion conferred upon the penalty jury is similar to that conferred on the trial court to punish certain crimes as either felonies or misdemeanors. Many sections of the Penal Code vest in the trial court discretion to sentence defendants convicted of such crimes to state prison or to jail, without mention of standards for exercise of that discretion. (E.g. Pen. Code, §§ 17, 476a, 489, 496, 524.) Such sections have been held not to violate due process or equal protection. (*In re Watkins, supra,* 64 Cal.2d 866, 869-870; *In re Rosencrantz,* 211 Cal. 749, 750-751 [297 P. 15]; *People* v. *Widener,* 220 Cal.App.2d 826, 830 [34 Cal.Rptr. 130]; cf. *Smith* v. *Rhay,* 254 F.2d 306, 308; *Daloia* v. *Rhay,* 252 F.2d 768, 770-771.) *In re Watkins, supra,* at page 870, states, '' 'Since every person charged with the offense has the same chance for leniency as well as the same possibility of receiving the maximum sentence, there is nothing discriminatory in the statute.' ''

It has been suggested that the similarity between the discretion conferred on a penalty jury to choose between life imprisonment and death and the discretion conferred on a trial court to sentence a defendant to state prison or to jail is only superficial because (1) the trial court, unlike the penalty jury, does not select between two legislatively neutral alternative penalties; (2) the trial court's sentencing discretion is circumscribed by standards inherent in the penological regime of rehabilitation, whereas the penalty jury's discretion is not so circumscribed; (3) the decision rendered by the trial court is of less gravity than that rendered by the penalty jury; and (4) the trial court's discretion is not absolute since the defendant may seek appellate review on the ground of abuse of discretion, whereas the penalty jury's discretion is absolute.

The asserted distinctions are not persuasive. In both cases the Legislature has prescribed the punishments available; in both it has authorized a specified body to make a choice within the legally prescribed limits. The fact that a crime punishable as a felony or a misdemeanor is regarded as a felony unless and until the trial court imposes a misdemeanor sentence (Pen. Code, § 17; *People* v. *Banks,* 53 Cal.2d 370, 380-383 [1 Cal.Rptr. 669, 348 P.2d 102]; *People* v. *Finley,* 219 Cal. App.2d 330, 341 [33 Cal.Rptr. 31]) does not show that the

Legislature prefers a felony sentence to be imposed by the trial court. Although the form of the choice by which the discretion conferred is to be exercised differs, this difference does not warrant contrary conclusions concerning the constitutionality of the respective statutes.

A defendant's potential for rehabilitation is but one of several factors the trial court considers in determining whether to sentence a defendant to jail or to state prison. The trial court also considers matters such as the community's need for protection (see *People* v. *Smith,* 259 Cal.App.2d 868, 873 [66 Cal.Rptr. 586]), and no specific standard controls the exercise of the trial court's discretion. ■ A defendant's potential for rehabilitation is similarly an appropriate factor for the penalty jury to consider in determining which penalty to impose. (See *People* v. *Morse,* 60 Cal.2d 631, 647 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810] ; see also *People* v. *Polk, supra,* 63 Cal.2d 443, 451.)

The trial court's decision may be of less gravity than that of the penalty jury, but both decisions involve grave consequences to the individuals involved. And finally, although the penalty jury has absolute discretion to determine which penalty to impose, such discretion, as we have seen, is absolute only in the first instance since the trial judge in ruling on a motion for a new trial, has the power to reduce the penalty to life imprisonment if in his independent judgment the weight of the evidence does not support the death penalty.

It should also be noted that *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, mentions lack of standards in selecting between death and life imprisonment and gives no intimation that the procedure is therefore unconstitutional.[5]

Reliance by petitioners upon *Giaccio* v. *Pennsylvania,* 382 U.S. 399 [15 L.Ed.2d 447, 86 S.Ct. 518], is misplaced. As we pointed out in *People* v. *Seiterle, supra,* 65 Cal.2d 333, 340

---

[5]*Witherspoon* states (at p. 519 [20 L.Ed.2d at p. 783]), ''Guided by neither rule nor standard, 'free to select or reject as it [sees] fit,' a jury that must choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life and death,[15]'' and footnote 15 reads in part ''[Illinois] has deliberately 'made . . . the death penalty . . . an optional form of punishment which [the jury remains] free to select or reject as it [sees] fit.' [Citation.] And one of the most important functions any jury can perform in making such a selection is to maintain a link between contemporary community values and the penal system—a link without which the determination of punishment could hardly reflect 'the evolving standards of decency that mark the progress of a maturing society.' (*Trop* v. *Dulles,* 356 U.S. 86, 101 [2 L.Ed.2d 630, 642, 78 S.Ct. 590].''

(cert. den. 387 U.S. 912), *Giaccio* "is not contrary to the cited cases [which held § 190.1 constitutional]. *Giaccio* held that a statute permitting a jury to assess costs against an acquitted defendant was constitutionally invalid because of vagueness and the absence of any standards sufficient to enable defendants to protect themselves against arbitrary and discriminatory imposition of costs. The court expressly stated in *Giaccio* that 'In so holding we intend to cast no doubt whatever on the constitutionality of the settled practice of many states to leave to juries finding defendants guilty of a crime the power to fix punishment within legally prescribed limits.' (382 U.S. at p. 405, fn. 8 [15 L.Ed.2d at p. 451].)" (See also *Maxwell* v. *Bishop, supra,* 398 F.2d 138, 149-150; *State of New Jersey* v. *Forcella, supra,* 52 N.J. 263 [245 A.2d 181].)

The instant case differs from *Skinner* v. *Oklahoma,* 316 U.S. 535 [86 L.Ed. 1655, 62 S.Ct. 1110], cited by petitioners. *Skinner* held that a statutory classification requiring sterilization under specified circumstances of persons convicted of larceny but not those convicted of embezzlement was a violation of equal protection. The court stated in part (at p. 541 [86 L.Ed. at p. 1660]) "When the law lays an unequal hand on those who have committed intrinsically the same quality of offense and sterilizes the one and not the other, it has made as invidious a discrimination as if it had selected a particular race or nationality for oppressive treatment." Penal Code sections 190 and 190.1, however, do not contain an unconstitutional classification, and, since under like circumstances every person convicted of first degree murder has the same chance for leniency as well as the same possibility of receiving the maximum sentence, there is nothing discriminatory in the sections.

■ There is, of course, a presumption in favor of constitutionality, and the invalidity of a legislative act must be clear before it can be declared unconstitutional. (*Eye Dog Foundation* v. *State Board of Guide Dogs for the Blind,* 67 Cal.2d 536, 549 [63 Cal.Rptr. 21, 432 P.2d 717]; *Patton* v. *La Bree,* 60 Cal.2d 606, 609 [35 Cal.Rptr. 622, 387 P.2d 398]; *In re Cregler,* 56 Cal.2d 308, 311 [14 Cal.Rptr. 289, 363 P.2d 305].)

· **[4b]** No authority has been cited holding that statutes like Penal Code sections 190 and 190.1 violate due·process or equal protection. For the reasons set forth above we are satisfied that we should not depart from our previous conclusion in this regard.

*No Delegation Of Legislative Power To Jury*

It is also asserted that Penal Code sections 190 and 190.1, as presently construed and applied, delegate to the penalty jury a legislative function in a manner that violates the section of the state Constitution providing for separation of powers (art. III, § 1). It is argued that the members of the jury have been delegated legislative powers because they must resolve basic policy questions with regard to the type of punishment to be imposed, as opposed to the extent of punishment to be imposed. That delegation is said to be improper because the sections do not contain standards sufficiently certain to preclude arbitrary exercise of that power by the jury, or to insure a reasonable opportunity of securing redress by judicial review if that power is abused. The same contention with regard to a statute similar to ours was rejected by the Supreme Court of Kansas in *State* v. *Latham, supra,* 375 P.2d 788, 798 : "The legislative power was exercised when the legislature fixed the punishment for murder in the first degree. The statute does no more than empower a jury, upon a consideration of all the evidence and the court's instructions, to assess the extent of punishment prescribed beforehand in accordance with the heinousness or gravity of the homicide. In performing that duty, the jury in no sense exercises legislative power." Similar contentions with regard to the court's power to impose penal sentences within legislatively fixed limits have likewise been rejected in several noncapital cases. (*People* v. *Pryor,* 17 Cal.App.2d 147, 152 [61 P.2d 773] ; *In re O'Shea,* 11 Cal.App. 568, 572 [105 P. 776] ; *State* v. *Logan,* 98 Ariz. 179 [403 P.2d 279, 280] ; *People* v. *Reid,* 396 Ill. 592 [72 N.E.2d 812] [cert. den. 332 U.S. 776 [92 L.Ed.361, 68 S.Ct. 39]].)

*Not Cruel Or Unusual Punishment*

It is next contended that for various reasons the death :penalty for first degree murder constitutes cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution and section 6, article I, of the California Constitution.[6]

Numerous cases have rejected claims that the death penalty

[6]The Eighth Amendment of the United States Constitution prohibits "cruel and unusual punishment." This amendment is, of course, applicable to the states. (*Robinson* v. *California,* 370 U.S. 660 [8 L.Ed.2d 758, 82 S.Ct. 1417].)

Section 6 of article I of the California Constitution provides, ". . . nor shall cruel or unusual punishment be inflicted."

for first degree murder constitutes cruel and unusual punishment per se. (E.g. *Wilkerson* v. *Utah*, 99 U.S. 130 [25 L.Ed. 345] ; *People* v. *Thomas*, 65 Cal.2d 698, 708 [56 Cal.Rptr. 305, 423 P.2d 233] [cert. den. 389 U.S. 868 [19 L.Ed.2d 143, 88 S.Ct. 140]] ; *People* v. *Bashor*, 48 Cal.2d 763, 765 [312 P.2d 255] ; *People* v. *Lazarus*, 207 Cal. 507, 514 [279 P. 145] ; see *Trop* v. *Dulles*, 356 U.S. 86, 99 [2 L.Ed.2d 630, 641, 78 S.Ct. 590] [plurality opinion] ; 21 Am.Jur.2d, pp. 544-545, 553-555 ; 24B C.J.S., p. 555 ; 5 Wharton's Criminal Law and Procedure (1957) p. 424; Mosk, *The Eighth Amendment Rediscovered* (1968) Loyola L.A. L.Rev., pp. 20-22; see also *Francis* v. *Resweber*, 329 U.S. 459, 463-464 [91 L.Ed. 422, 426-427, 67 S.Ct. 374] [plurality opinion].)

Petitioners urge us to reconsider the matter. They argue that the death penalty is cruel and unusual punishment because it "inflicts the loss of life without commensurate justification." They assert that life is a fundamental right, that before the state may restrict a fundamental right it must demonstrate a "compelling interest" in so doing, and that to show such an interest the state must establish that (1) the restriction imposed rationally relates to legitimate governmental objectives sought; (2) the benefit to the public far outweighs the impairment of the constitutional right, and (3) no alternative means less subversive of the constitutional right are available. Petitioners assert that the state's compelling interest is the punishment of criminals, that the proper functions of punishment are isolation, rehabilitation and deterrence, and do not include retribution (see *In re Estrada*, 63 Cal.2d 740, 745 [48 Cal.Rptr. 172, 408 P.2d 948]), and that isolation and rehabilitation can better be achieved by life imprisonment than execution. They offer to establish at an evidentiary hearing that the death penalty is not a more effective deterrent than life imprisonment. Petitioners cite cases applying a compelling interest test in contexts other than the question of the validity of a statute imposing a penalty for a crime. (E.g. *Sherbert* v. *Verner*, 374 U.S. 398, 406 [10 L.Ed.2d 965, 971, 83 S.Ct. 1790] ; *N.A.A.C.P.* v. *Button*, 371 U.S. 415, 438-444 [9 L.Ed.2d 405, 421-424, 83 S.Ct. 328] ; *Parrish* v. *Civil Service Com.*, 66 Cal.2d 260, 271 [57 Cal.Rptr. 623, 425 P.2d 223].)

■ "The fixing of penalties for crime is a legislative function. What constitutes an adequate penalty is a matter of legislative judgment and discretion and the courts will not interfere therewith unless the penalty prescribed is clearly

and manifestly cruel and unusual." (*People* v. *Tanner*, 3 Cal.2d 279, 298 [44 P.2d 324]; *People* v. *Keller*, 245 Cal.App. 2d 711, 714-715 [54 Cal.Rptr. 154].) In *Trop* v. *Dulles, supra* (1958) 356 U.S. 86, 99 [2 L.Ed.2d 630, 641] (plurality opinion), which concluded that denationalization for wartime desertion constituted a cruel and unusual punishment within the meaning of the Eighth Amendment, it was stated, "[L]et us put to one side the death penalty as an index of the constitutional limit on punishment. Whatever the arguments may be against capital punishment, both on moral grounds and in terms of accomplishing the purposes of punishment—and they are forceful—the death penalty has been employed throughout our history, and, in a day when it is still widely accepted, it cannot be said to violate the constitutional concept of cruelty."

Petitioners further argue that the death penalty is cruel and unusual in that it is imposed without standards and can be imposed regardless of extenuating circumstances. The absence of so-called standards has previously been discussed. ▮ It seems clear that the death penalty, which has been repeatedly upheld against claims that it constitutes cruel and unusual punishment per se,[7] does not become cruel or unusual as a result of the Legislature's vesting in the trier of fact discretion to extend mercy to a convicted first degree murderer.

In contending that the death penalty is unconstitutional, amici point to the statement in *Trop* v. *Dulles, supra*, 356 U.S. 86, 101 [2 L.Ed.2d 630, 642], that the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." An amicus curiae brief also contends that the death penalty violates the Eighth Amendment because it "drives men mad and to suicide." In support of these contentions amici point to testimony in People v. Thornton, Los Angeles Superior Court No. 328445, and to various documents. The matters pointed to do not disclose the percentage of prisoners on death row who during any recent period, as a result of being under the death sentence, attempted suicide or became insane. In any event, in a day when the death penalty "is still widely accepted, it cannot be said to violate the constitutional concept of cruelty." (See *Trop* v. *Dulles, supra*, 356 U.S. 86, 99 [2 L.Ed.2d 630, 641] [plurality opinion].)

The fact that under Penal Code section 3604 the death penalty is inflicted by the administration of "a lethal gas"

---

[7]See authorities on page 630.

does not render the punishment cruel or unusual. (*People* v. *Daugherty,* 40 Cal.2d 876, 894 [256 P.2d 911] [cert. den. 346 U.S. 827 [98 L.Ed. 352, 74 S.Ct. 47]; reh. den. 346 U.S. 880 [98 L.Ed. 387, 74 S.Ct. 120]].)

A further contention is made that the ''anguish of the 1,000 day wait on death row and the attendant deterioration of personality'' renders the death penalty cruel and unusual. To support the assertion of such anguish and deterioration extracts from books and testimony in People v. Thornton, *supra,* Los Angeles Superior Court No. 328445, are set forth in an amicus brief. A similar contention was rejected in *People* v. *Chessman,* 52 Cal.2d 467, 498-499 [341 P.2d 679] (cert. den. 361 U.S. 925 [4 L.Ed.2d 241, 80 S.Ct. 296]; pet. for reh. den. 361 U.S. 941 [4 L.Ed.2d 362, 80 S.Ct. 383]). There the defendant was detained pending execution of sentence of death for more than 11 years during which period various matters of which he complained were litigated. He contended that such confinement constituted cruel and unusual punishment. We recognized that mental suffering undoubtedly attended his detention, indicated that there had not been unreasonable delay by California in the proceedings, and concluded that unconstitutionally cruel or unusual punishment had not been imposed.

*Basic Due Process Not Violated*

Amici next contend that, independently of the constitutional prohibition against cruel and unusual punishment, life is a fundamental right protected from state interference absent a compelling state interest, and they argue at length that the state cannot establish the existence of such an interest. They also suggest that under tests other than that of a compelling state interest the death penalty violates due process. However, the fixing of penalties for a crime is a legislative function. (*People* v. *Wade,* 53 Cal.2d 322, 336 [1 Cal. Rptr. 683, 348 P.2d 116]; *People* v. *Tanner, supra,* 3 Cal.2d 279, 298; *People* v. *Quilon,* 245 Cal.App.2d 624, 629 [54 Cal. Rptr. 294]; *People* v. *Olson,* 173 Cal.App.2d 535, 536-537 [343 P.2d 379]), and we will not nullify the legislative judgment as to the appropriate penalties for the heinous crime of first degree murder. It is for the Legislature and not this court to decide whether it is sound public policy to empower the imposing of the death penalty. (See *Robinson* v. *United States,* 324 U.S. 282, 286 [89 L.Ed. 944, 947, 65 S.Ct. 666].)

*Counsel For Indigent Defendants*

Petitioners further contend that the due process and equal

protection clauses of the United States Constitution confer upon indigent defendants in capital cases the right to appointed counsel throughout the period between the termination of their state appeals and their execution. They argue that the state must appoint counsel for such defendants to represent them with respect to appeals or petitions for certiorari to the United States Supreme Court, habeas corpus petitions to federal courts, and applications for executive clemency, and to institute and represent such defendants at sanity hearings conducted under Penal Code sections 3700 et seq.

Petitioners had counsel on appeal (*People* v. *Saterfield, supra,* 65 Cal.2d 752; *People* v. *Anderson, supra,* 64 Cal.2d 633), and no claim is made that they were denied their right to counsel at any stage prior thereto. Their argument is directed to the post-state-appeal period, one which, of course, may be of many years duration as a result of a prisoner's litigating and relitigating his claims in various courts.

It is undisputed that petitions for certiorari were filed by petitioners in propria persona; that petitioners were then, and are now, indigent; that Saterfield has a pending application for executive clemency; that, although Saterfield has counsel in the instant proceeding and a related one in a federal court, he is otherwise unrepresented by counsel; and that Anderson is now represented for all purposes by an attorney. 

We believe that it will protect the interests of defendants and promote the cause of justice for this court to appoint counsel to represent indigent defendants in capital cases in the following proceedings undertaken between the termination of their state appeals and their execution: (a) Proceedings in this court for post-conviction review; (b) Proceedings for appellate or other post-conviction review of state court judgments in the United States Supreme Court, subject however to the power of that court to appoint counsel therein; (c) Applications for executive clemency, and the conduct of sanity hearings where indicated. Hereafter, as a matter of policy, and upon application of the defendant, we will appoint counsel in such instances.[8] Any request for the appointment of coun-

---

[8]It should also be noted that under an amendment to Penal Code section 1239, effective the 61st day after the adjournment of the 1968 Regular Session, indigent capital defendants will have a statutory right to appointed counsel in certain proceedings. The amendment provides: ''If the defendant [in a capital case] is unable to afford the services of counsel, the Supreme Court shall appoint counsel to represent him in any appeal to the Supreme Court, or any appeal or other review in the Supreme Court of the United States.''

sel in any other proceeding should be addressed to the court in which the proceeding is brought.

*Conclusion*

Other contentions, exhaustively briefed and argued in the extensive and carefully prepared briefs of counsel and amici, are not relevant to the issues presented in these cases, or lack merit, or concern matters that may not arise upon the penalty retrials.

We denied petitioners' request for an evidentiary hearing relating to their various contentions in December 1967. They have again requested such a hearing. That request is likewise denied.

Sections 190 and 190.1 were the result of an exercise by our Legislature of power vested in it by the Constitution and an exercise by the Governor of his power in approving the bills and making them ''the law.'' To sustain the sections is to respect the actions of the two branches of our government directly responsive to the will of the people and empowered under the Constitution to determine the wisdom of the legislation. It is, of course, our duty to strike down unconstitutional statutes, but we are not entrusted with their wisdom. The constitutionality of sections 190 and 190.1 has previously been upheld, and in our opinion properly so. Petitioners were found guilty of the heinous crime of first degree murder, and their judgments were affirmed.

Under the compulsion of *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, the writs were granted as to the penalty trials. The remittiturs issued in Crim. 10126, *People* v. *Saterfield,* and Crim. 9317, *People* v. *Anderson,* are recalled and the judgments imposing the death penalty are reversed insofar as they relate to the penalty. In all other respects they are affirmed. Saterfield is remanded to the custody of the Orange County Superior Court and Anderson to the custody of the San Diego County Superior Court for new trials on the issue of penalty.

Mosk, J., and Sullivan, J., concurred.

MOSK, J.—I concur in the opinion of Justice Burke.

In my years as Attorney General of California (1959-1964), I frequently repeated a personal belief in the social invalidity of the death penalty, notably in testimony before California legislative committees in March 1959, July 1960, and April 1963.

Naturally, therefore, I am tempted by the invitation of petitioners to join in judicially terminating this anachonistic

penalty. However, to yield to my predilections would be to act wilfully "in the sense of enforcing individual views instead of speaking humbly as the voice of law by which society presumably consents to be ruled. . . ." (Frankfurter, *The Supreme Court in the Mirror of the Justices* (1957) 105 U.Pa.L.Rev. 781, 794.)

As a judge, I am bound to the law as I find it to be and not as I might fervently wish it to be. I conclude that Justice Burke has properly stated the current law of California and of every other American jurisdiction that has considered the problem.

TOBRINER, J.—I concur with the opinion of Justice Burke insofar as it holds that *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], requires that we set aside the penalty previously imposed in the two cases now before us. I agree that indigent defendants in capital cases should be entitled to appointed counsel throughout the period between the termination of their state appeals and their execution. I submit, however, that sections 190 and 190.1 of the Penal Code of California violate the Fourteenth Amendment of the Constitution of the United States because they provide no standards or tests whatsoever to enable judge or jury to decide why one convicted capital defendant should die and another should live. The California penalty trial leaves this vital decision to the unguided whim and caprice of the trier of fact; this irrational process, the antithesis of due process, has no place in the constitutional structure of American law.

The present petitions for habeas corpus require this court for the first time to conduct a full-scale inquiry into the constitutionality of the administration of the death penalty in California. Although the Legislature bears the responsibility for fixing the penalty for a given crime, we cannot avoid our own obligation to decide whether the present process of decreeing the penalty of death conflicts with the Constitution. The hard task of reaching such a decision must be a judicial one; we cannot evade it by saying it should be discharged by some other branch of government.

Two recent decisions of the United States Supreme Court, *United States* v. *Jackson* (1968) 390 U.S. 570 [20 L.Ed.2d 138, 88 S.Ct. 1209], and especially *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, compel us to reexamine the contention that the lack of prescribed standards in the administration of the death penalty takes the life of the capital defendant with-

out the protection of due process and the equal protection of the laws. Our prior decisions have assumed that constitutional doctrines applicable to statutes regulating conduct and to the process of determining guilt did not govern statutes prescribing penalties; our cases predicated a constitutionally significant difference between these two types of statutes. We struck down as unconstitutional the regulation of conduct by statutes that lacked ascertainable standards or that permitted arbitrary classification (see, e.g., *In re Newbern* (1960) 53 Cal.2d 786 [3 Cal.Rptr. 364, 350 P.2d 116]; *People* v. *McCaughan* (1957) 49 Cal.2d 409 [317 P.2d 974]; *Perez* v. *Sharp* (1948) 32 Cal.2d 711 [198 P.2d 17]) but we sustained the imposition of the penalty of death by statutes subject to such constitutional infirmity.

In *Jackson* and *Witherspoon* the United States Supreme Court for the first time adjudged the constitutionality of the procedure for imposition of the death penalty in light of constitutional doctrines traditionally applied to statutes proscribing conduct or involving the guilt-determination process. *Jackson* and *Witherspoon* therefore require us to reject the distinction implicit in our prior decisions between the death penalty procedure, on the one hand, and the guilt-determination process and statutes regulating conduct, on the other hand. Moreover, as we shall explain, *Witherspoon* makes clear that even if some forms of sentencing discretion differ in a constitutionally significant manner from guilt-determination processes, the imposition of the death penalty cannot be treated as simply another form of sentencing when it involves constitutional rights basic to procedural fairness. We must therefore consider afresh the constitutionality of the administration of the death penalty in California in light of the traditional line of cases holding that the due process and equal protection clauses of the Fourteenth Amendment protect against loss of a fundamental right—here, life itself—by an arbitrary power of decision.

In *Jackson,* the United States Supreme Court invoked the ''overbreadth'' doctrine,[1] traditionally a First Amendment

---

[1]The Supreme Court has traditionally applied the ''overbreadth'' doctrine in cases involving regulation of conduct protected by the First Amendment. The requirement that statutes be not ''overly broad'' in their application, so that First Amendment liberties are not unnecessarily infringed, is typically stated in the following terms: ''A statute touching those protected rights must be 'narrowly drawn to define and punish specific conduct as constituting a clear and present danger to a substantial interest of the State.' *Cantwell* v. *Connecticut*, 310 U.S. 296, 311 [84 L.Ed.2d 1213, 1221, 60 S.Ct. 900, 128 A.L.R. 1352]. Legitimate

doctrine which the court applied to statutes regulating conduct, to nullify the penalty provisions of the Federal Kidnaping Act (18 U.S.C., § 1201(a).)[2] The Supreme Court reasoned that the statute, in providing in effect that only a jury, and not a judge, could impose the death penalty, "needlessly *encourages*" waivers of jury trials and guilty pleas. (390

legislative goals 'cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.' *Shelton* v. *Tucker*, 364 U.S. 479, 488 [5 L.Ed.2d 231, 237, 81 S.Ct. 247]." (*Elfbrandt* v. *Russell* (1966) 384 U.S. 11, 18 [16 L.Ed.2d 321, 325, 86 S.Ct. 1238].)

The "overbreadth" doctrine, like the "void-for-vagueness" doctrine (see discussion of *Giaccio, infra*), prohibits loosely drawn statutes. The purpose of each differs, however. The former serves to prevent the state from needlessly interfering with protected rights when it can achieve its legitimate legislative purposes by a statute with a narrower application. The void-for-vagueness doctrine, on the other hand, seeks to prevent deprivation of fundamental rights by the imposition of a statute whose terms make its application uncertain. Both doctrines are often applicable, however, to the same statute. (See, *e.g., Baggett* v. *Bullitt* (1964) 377 U.S. 360, 366-373 [12 L.Ed.2d 377, 382-386, 84 S.Ct. 1316]; *NAACP* v. *Button* (1963) 371 U.S. 415, 432-433 [9 L.Ed.2d 405, 417-418, 83 S.Ct. 328].)

The Supreme Court relied upon two First Amendment cases applying the "overbreadth" doctrine in *Jackson*: *Shelton* v. *Tucker* (1960) 364 U.S. 479 [5 L.Ed.2d 231, 81 S.Ct. 247], and *United States* v. *Robel* (1967) 389 U.S. 258 [19 L.Ed.2d 508, 88 S.Ct. 419]. *Shelton* held unconstitutional a state statute requiring every teacher to file annually an affidavit listing every organization to which he had belonged or regularly contributed during the preceding five years. Recognizing the propriety of the underlying state purpose, *Shelton* held only that the purpose could be achieved by a more narrowly drawn statute which would infringe less upon First Amendment rights.

*Robel* struck down a section of the 1950 Subversive Activities Control Act which provided that when a Communist-action organization is under a final order to register, it shall be unlawful for any member of the organization "to engage in any employment in any defense facility." (50 U.S.C., § 784(a)(1)(D).) The Supreme Court reasoned that the legitimate congressional purpose of "national defense" could be achieved by means less destructive of First Amendment rights.

[2]The statute provides that the convicted defendant " 'shall be punished (1) by death if the kidnaped person has not been liberated unharmed, and if the verdict of the jury shall so recommend, or (2) by imprisonment for any term of years or for life, if the death penalty is not imposed.' This statute thus creates an offense punishable by death 'if the verdict of the jury shall so recommend.' The statute sets forth no procedure for imposing the death penalty upon a defendant who waives the right to jury trial or upon one who pleads guilty." (*United States* v. *Jackson, supra*, 390 U.S. 570, 571 [20 L.Ed.2d 138, 141].)

Admittedly, our death penalty procedure does not involve this defect (as pointed out in Justice Burke's opinion, page 625, footnote 4). The importance of *Jackson* is not that the holding applies here, but that the rationale used by the court—a rationale which heretofore has been applied only in cases involving conduct as opposed to penalties—requires us to reconsider our prior decisions which necessarily assume that the constitutionality of the death penalty procedure is not to be tested by the same constitutional standards governing guilt-determining procedures and statutes which proscribe criminal conduct.

U.S. at p. 583 [20 L.Ed.2d at p. 148].) The Supreme Court concluded that since Congress could accomplish its alleged "mitigating" purpose[3] in a manner more consonant with the constitutional rights of the capital defendant, the statutory procedure for imposing the death penalty violated the Constitution.

Although *Jackson* involved a federal statute and explicitly dealt with a penalty procedure which impaired the right to a jury trial on the issue of guilt,[4] the rationale of *Jackson* bears upon the present issue for two major reasons. First, as pointed out above, *Jackson* rested on the constitutional doctrine of overbreadth, which has traditionally been applied only to statutes which regulate conduct. Indeed, the Supreme Court has traditionally invoked this doctrine to protect First Amendment rights as opposed to the rights of a criminal defendant encompassed in the Fourth, Fifth, Sixth, and Fourteenth Amendments. The two cases cited in *Jackson* to support the proposition that the death penalty cannot be constitutionally administered in a manner which "needlessly chill[s] the exercise of basic constitutional rights" (390 U.S. at p. 582 [20 L.Ed.2d at p. 147]), *United States* v. *Robel, supra,* 389 U.S. 258, and *Shelton* v. *Tucker, supra,* 364 U.S. 479 (See fn. 1, *supra*), both involved the extent to which, respectively, Congress and a state could, consistently with the First Amendment, prohibit or require certain conduct as a condition of public employment. *Jackson,* on the other hand, like the present case, involves a statute prescribing a procedure for imposing the death penalty which was attacked on the ground that such procedure unduly infringed the rights of a criminal defendant. .

Secondly, *Jackson* expressly rejected the argument that the procedure for the imposition of the death penalty escaped constitutional attack on the ground that the statutory scheme for an alternative penalty of life imprisonment "operates 'to mitigate the severity of [capital] punishment.'" (390 U.S. at p. 582 [20 L.Ed.2d at p. 147].) In response to the government's contention that the procedure should be upheld be-

[3] "The Government suggests that, because the Act thus operates 'to mitigate the severity of punishment,' it is irrelevant that it 'may have the incidental effect of inducing defendants not to contest in full measure.' We cannot agree." (*United States* v. *Jackson, supra,* 390 U.S. 570, 582 [20 L.Ed.2d 138, 147].)

[4] Cf. *Duncan* v. *Louisiana* (1968) 391 U.S. 145 [20 L.Ed.2d 491, 88 S.Ct. 1444], holding that the due process clause of the Fourteenth Amendment "incorporates" the Sixth Amendment right to a trial by jury in state criminal cases.

cause Congress thereby dispensed mercy through the jury by providing an alternative penalty to death for capital offenders, the Supreme Court stated: "Whatever might be said of Congress' objectives, they cannot be pursued by means that needlessly chill the exercise of basic constitutional rights. Cf. *United States* v. *Robel*, 389 U.S. 258 [19 L.Ed.2d 508, 88 S.Ct. 419]; *Shelton* v. *Tucker*, 364 U.S. 479, 488-489 [5 L.Ed.2d 231, 237-238, 81 S.Ct. 247]. . . . The Congress can of course mitigate the severity of capital punishment. . . . [But] whatever the power of Congress to impose a death penalty for violation of the Federal Kidnaping Act, Congress cannot impose such a penalty in a manner that needlessly penalizes the assertion of a constitutional right." (390 U.S. at pp. 582-583 [20 L.Ed.2d at p. 147].)

*Jackson's* explicit rejection of the government's attempt to justify the death penalty procedure prescribed by the Federal Kidnaping Act thus exposes the fallacy of the statement in Justice Burke's opinion that "[a] statute *mitigating capital punishment* is not essentially unfair to the wrongdoer for failure to specify standards for the exercise of that discretion." (Italics added.) (*Ante,* p. 625.) Of course, sections 190 and 190.1 may, like the Federal Kidnaping Act, "have as an objective the avoidance of 'the more drastic alternative of mandatory capital punishment in every case. . . .' " (*Ante,* p. 626.) But to infer that the procedure prescribed by sections 190 and 190.1 may withstand any constitutional scrutiny because they " 'may be viewed as ameliorating the severity of the more extreme punishment that Congress [or the state Legislature] might have wished to provide' " rests on a basic misunderstanding of the *Jackson* decision.

The statement from *Jackson* quoted by the majority[5] must be read in light of the immediately succeeding paragraph in which the Supreme Court states: "The Government suggests that, because the Act thus operates 'to mitigate the severity of punishment,' it is irrelevant that it 'may have the incidental effect of inducing defendants not to contest in full measure.' *We cannot agree. Whatever might be said of Congress'* [or in

---

[5]The death penalty procedure prescribed by the Federal Kidnaping Act "avoids the more drastic alternative of mandatory capital punishment in every case. In this sense, the selective death penalty procedure established by the Federal Kidnaping Act may be viewed as ameliorating the severity of the more extreme punishment that Congress might have wished to provide." (390 U.S. at pp. 581-582 [20 L.Ed.2d at p. 147]; *ante,* pp. 625-626.)

this case the state Legislature's] *objectives, they cannot be pursued by means that needlessly chill the exercise of basic constitutional rights. . . .* The Congress [or the state Legislature] can of course mitigate the severity of capital punishment. . . . But that goal can be achieved without penalizing those defendants who plead not guilty and demand jury trial [i.e., without a procedure impairing fundamental constitutional rights] . . . [I]t is clear that the selective death penalty provision of the Federal Kidnaping Act cannot be justified by its ostensible purpose.'' (Italics added.) (390 U.S. at p. 582 [20 L.Ed.2d at p. 147].)

*Jackson* thus teaches that irrespective of the propriety of the death penalty itself or the provision of an alternative penalty to ''mitigate the severity of capital punishment,'' we must examine the *procedure* for imposition of the penalty. We must determine whether that procedure deprives capital defendants of fundamental rights inherent in the administration of criminal justice.

*Witherspoon,* even more than *Jackson,* makes clear that death penalty procedures must comply with basic strictures of the Fourteenth Amendment. *Witherspoon's* holding that the penalty jury must be *composed* in a manner consonant with the due process clause requires that we consider whether the penalty jury *functions* in a manner consonant with due process.

The Supreme Court in *Witherspoon* stated: ''Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a *tribunal so selected.*

''Whatever else might be said of capital punishment, it is at least clear that its imposition by a hanging jury cannot be squared with the Constitution. The State of Illinois has stacked the deck against the petitioner. To execute this death sentence would deprive him of his life without *due process of law.''* (Italics added; fns. omitted.) (391 U.S. at pp. 521-523 [20 L.Ed.2d at pp. 785-786].)

In determining whether a death sentence imposed by a tribunal that functions without prescribed standards deprives the capital defendant ''of his life without due process of law,'' we must heed the Supreme Court's explanation in

*Witherspoon* of the unique function that such a tribunal performs.

"It should be understood that much more is involved here than a simple determination of sentence. For the State of Illinois [as does the State of California under sections 190 and 190.1 of the Penal Code] empowered the jury in this case to answer 'yes' or 'no' to the question whether this defendant was fit to live. To be sure, such a determination is different in kind from a finding that the defendant committed a specified criminal offense. Insofar as a determination that a man should be put to death might require 'that there be taken into account the circumstances of the offense together with the character and propensities of the offender,' *Pennsylvania* v. *Ashe,* 302 U.S 51, 55 [82 L.Ed. 43, 46, 58 S.Ct. 59], for example, it may be appropriate that certain rules of evidence with respect to penalty should differ from the corresponding evidentiary rules with respect to guilt. See, *e.g., Williams* v. *New York,* 337 U.S. 241 [93 L.Ed. 1337, 69 S.Ct. 1079]. *But this does not mean that basic requirements of procedural fairness can be ignored simply because the determination involved in this case differs in some respects from the traditional assessment of whether the defendant engaged in a proscribed course of conduct."* (Italics added.) (391 U.S. at p. 521, fn. 20 [20 L.Ed.2d at p. 784].)

*Witherspoon* therefore squarely stands for the proposition that the requirements of the Fourteenth Amendment—those that go to the very fairness and integrity of the penalty-determining process—apply to the procedure pursuant to which the state, be it by judge or jury, takes the life of a capital offender. *Witherspoon* holds that the exclusion of veniremen for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction" violates the "basic requirements of procedural fairness" demanded by the Fourteenth Amendment. Similarly, we must now recognize that a tribunal endowed with unbridled discretion to determine whether a convicted capital defendant shall live or die cannot constitutionally administer the death penalty.

Although the discretionary imposition of the death penalty has long been practiced, no length of uncritical history or mindless tradition may sanction a procedure when "the unconstitutionality of the course pursued has . . . been made clear." (*Erie R.R. Co.* v. *Tompkins* (1938) 304 U.S. 64, 77-78 [82 L.Ed. 1188, 1193-1194, 58 S.Ct. 817, 114 A.L.R. 1487] ; see also *Malloy* v. *Hogan* (1964) 378 U.S. 1, 5 [12 L.Ed.2d 653,

657, 84 S.Ct. 1489]; *Brown* v. *Board of Education* (1954) 347 U.S. 483, 492-495 [98 L.Ed. 873, 878-881, 74 S.Ct. 686, 38 A.L.R.2d 1180]; *Perez* v. *Sharp, supra,* 32 Cal.2d 711, 727.) Chief Justice Warren has said: ''when society acts to deprive one of its members of his life, liberty or property, it takes its most awesome steps. . . . The methods we employ in the enforcement of our criminal laws have aptly been called the measures by which the quality of our civilization may be judged.'' (*Coppedge* v. *United States* (1962) 369 U.S. 438, 449 [8 L.Ed.2d 21, 30, 82 S.Ct. 917]; *Douglas* v. *California* (1963) 372 U.S. 353, 357, fn. 2 [9 L.Ed.2d 811, 814, 83 S.Ct. 814].)

The long span of guideless imposition of the death penalty is no justification for it. If there has been error, its repetition here cannot condone it. The longevity of an erroneous constitutional interpretation is no ground for its preservation.

We begin by reviewing the nature of the procedure under which convicted capital defendants are condemned to death or permitted to live.

I. *Sections 190 and 190.1 of the Penal Code confer absolute discretion on the trier of fact and thereby require the trier of fact to perform a sui generis function which subjects the convicted capital defendant to a power of arbitrary decision.*

Section 190 of the Penal Code provides that ''every person guilty of murder in the first degree shall suffer death, or confinement in the state prison for life, at the discretion of the court or jury trying the same, and the matter of punishment shall be determined as provided in Section 190.1.'' Section 190 does not articulate any purpose or prescribe any standards to guide the trier of fact in its determination of the penalty. Section 190.1 provides that at the penalty trial, ''evidence may be presented . . . of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty. The determination of the penalty of life imprisonment or death shall be in the discretion of the court or jury trying the issue of fact on the evidence presented.''

Section 190.1 does not explain which circumstances or background facts should be considered as aggravating and which as mitigating, nor the extent of aggravation or mitigation necessary, for the imposition or withholding of the ultimate penalty. Indeed, we have previously held that the section does not require the jury to give any effect at all to evidence of either aggravating or mitigating circumstances. ''The jury

does not have to find ameliorating circumstances to impose life imprisonment, nor need it find aggravation to impose the death penalty. The choice between the two rests in the absolute discretion of the jury.'' (*People* v. *Hamilton* (1963) 60 Cal.2d 105, 136 [32 Cal.Rptr. 4, 383 P.2d 412]; see also *People* v. *Lane* (1961) 56 Cal.2d 773, 786 [16 Cal.Rptr. 801, 366 P.2d 57].

Pursuant to these rulings the jury is currently instructed that ''it is not essential to your decision that you find mitigating circumstances on the one hand or evidence in aggravation of the offense on the other. . . . Notwithstanding facts, if any, proved in mitigation or aggravation, in determining which punishment shall be inflicted, you are entirely free to act according to your own judgment, conscience and absolute discretion. . . . Beyond prescribing the two alternative penalties, the law itself provides no standard for the guidance of the jury in the selection of the penalty, but, rather, commits the whole matter of determining which of the two penalties shall be fixed to the judgment, conscience and absolute discretion of the jury.'' (CALJIC (1967 Cumulative Pocket Part) No. 306.1, at p. 126.)

Although the Legislature, in establishing the alternative punishments of death and life imprisonment for first degree murder, must have considered that some capital offenders deserved the ultimate penalty while others should be sentenced to life imprisonment, it did not prescribe any standards to guide the trier of fact in making that critical classification.[6] Thus in past decisions we have construed sections 190 and 190.1 to vest in the trier of fact an ''absolute'' discretion to determine whether the particular convicted capital defendant should properly be punished by death or life imprisonment. (E.g., *People* v. *Hines* (1964) 61 Cal.2d 164, 168-169 [37 Cal.Rptr. 622, 390 P.2d 398]; *People* v. *Mason* (1960) 54 Cal.2d 164, 169 [4 Cal.Rptr. 841, 351 P.2d 1025]; *People* v. *Green* (1956) 47 Cal.2d 209, 232 [302 P.2d 307]; Comment, *The California Penalty Trial* (1964) 52 Cal.L.Rev. 386, 389.)

The decisions applying sections 190 and 190.1 describe the ''absolute'' nature of the discretion presently vested in the trier of fact during the penalty trial. That discretion is not only unguided and unlimited, its exercise is not even subject to review on the question of abuse. (*People* v. *Odle* (1951) 37

---

[6] Comment, *Scope of Appellate Review of Sentences in Capital Cases* (1960) 108 U.Pa.L.Rev. 434, 444; see generally, Knowlton, *Problems of Jury Discretion in Capital Cases* (1953) 101 U.Pa.L.Rev. 1099.

Cal.2d 52, 57-59 [230 P.2d 345]; see also *People* v. *Ortega* (1953) 41 Cal.2d 621, 622 [262 P.2d 2]; *People* v. *Harrison* (1953) 41 Cal.2d 216, 219 [258 P.2d 1016]; *People* v. *Thomas* (1951) 37 Cal.2d 74, 78 [230 P.2d 351]; *People* v. *Danielly* (1949) 33 Cal.2d 362, 383 [202 P.2d 18]; *People* v. *Tuthill* (1948) 32 Cal.2d 819, 827 [198 P.2d 505].)

This absolute discretion imposes on the trier of fact an "onerous task" (*People* v. *Friend* (1957) 47 Cal.2d 749, 765 [306 P.2d 463]) which is totally unlike its normal duties. "The jury's task assumes formidable proportions because it transcends the usual function of finding whether or not certain events occurred and certain consequences resulted from them. The jury in this instance performs no such circumscribed task; it must in each particular case, depending wholly on the kind of defendant and nature of facts before it, decide the issue of life or death. In reaching its crucial decision, although Penal Code section 190.1 states it may consider 'facts in aggravation or mitigation of the penalty,' the jury has no guidelines, no standards, no criteria." (*People* v. *Morse* (1964) 60 Cal.2d 631, 643 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].) "In all other situations than the penalty trial the jury deliberates under the court's instructions and reaches its verdict within the area delineated by the judge. . . . In all other situations than the penalty trial the evidence must be narrowed down to the point at issue; . . ." (*People* v. *Hines, supra,* 61 Cal.2d 164, 168-169.)

As a result of this vesting of "absolute" discretion in the trier of fact and the consequent destruction of the procedural safeguard of review, the penalty jury "may conceivably rest the death penalty upon any piece of introduced data [or upon no evidence whatsoever]. The precise point which prompts the penalty in the mind of any one juror is not known to us and may not even be known to him. Yet this dark ignorance must be compounded 12 times and deepened even further by the recognition that any particular factor may influence any two jurors in precisely the opposite manner." (*People* v. *Hines, supra,* 61 Cal.2d at p. 169.)

We shall now explain that the entire fate of an individual human being—the basic question whether he shall live or die —cannot constitutionally be subjected to an unguided and unlimited power of arbitrary decision.

II. *Imposition of the death penalty in the absence of any prescribed standards deprives the capital defendant sentenced to death of his life without due process of law in violation of the Fourteenth Amendment.*

Nothing could be more basic to the due process clause or to the requirement of procedural fairness (see *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 521, fn. 20 [20 L.Ed.2d 776, 785]) than that a person not suffer the arbitrary deprivation of his life or liberty. The constitutional imperative that laws infringing upon life and liberty be framed in terms of reasonably ascertainable standards is central to our admnistration of criminal justice. The absence of any standards to circumscribe the trier of fact's discretion under sections 190 and 190.1 of the Penal Code to determine whether a convicted capital defendant shall suffer death or life imprisonment therefore deprives the capital defendant condemned to death of his life without due process of law.

"The requirement of a reasonable degree of certainty in legislation, especially in the criminal law, is a well established element of the guarantee of due process of law." (*In re Newbern, supra,* 53 Cal.2d 786, 792; *Winters* v. *New York* (1948) 333 U.S. 507, 509-510, 515 [92 L.Ed. 840, 846-847, 849, 68 S.Ct. 665].) The constitutional requirement for certainty in the criminal law serves to protect two basic sets of rights deemed fundamental to the administration of criminal justice. The first is crystallized in the constitutional concept of "notice";[7] the second in the demand for procedural safeguards and an opportunity for meaningful review.[8]

A criminal law which is not framed in terms of sufficiently

---

[7]Conviction under a statute which fails "to give fair notice of what acts will be punished . . . violates an accused's rights under procedural due process . . . ." (*Winters* v. *New York, supra,* 333 U.S. 507, 509-510 [92 L.Ed. 840, 846-847].) "The standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanction for enforcement. . . . There must be ascertainable standards of guilt. Men of common intelligence cannot be required to guess at the meaning of the enactment." (*Id.* at p. 515 [92 L.Ed. at p. 849].)

" 'It is the duty of the lawmaking body in framing laws to express its intent in clear and plain language to the end that the people upon whom it is designed to operate may be able to understand the legislative will.' [Citations.]" (*Perez* v. *Sharp, supra,* 32 Cal.2d 711, 728.)

[8]Although the due process clause does not require a state to provide an appeal from a criminal conviction, nevertheless, when the state does provide such an appeal it cannot sanction procedures which render that appeal meaningless or deprive one class of convicted defendants of the opportunity to secure redress for an incorrect application of the law to them. (*Griffin* v. *Illinois* (1956) 351 U.S. 12, 18 [100 L.Ed. 891, 898, 76 S.Ct. 585, 55 A.L.R.2d 1055]; *Frank* v. *Mangum* (1915) 237 U.S. 309, 327 [59 L.Ed. 969, 980, 35 S.Ct. 582].)

Conviction under a procedure which prevented "an appellate court [from reviewing] the facts and law of a case and intelligently decid[ing] whether the findings of the lower court are supported by evidence . . . would be a denial of due process." (*Garner* v. *Louisiana* (1961) 368 U.S. 157, 173 [7 L.Ed.2d 207, 219, 82 S.Ct. 248].)

ascertainable standards violates the due process clause in the first instance because it fails to give adequate warning of its own proscription. (*Winters* v. *New York, supra,* 333 U.S. 507, 509-510, 515 [92 L.Ed. 840, 846-847, 849].) Correlatively, in order to protect the accused's right to "a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial," he cannot constitutionally be convicted without being "advised of the charges against him." (*In re Hess* (1955) 45 Cal.2d 171, 175 [288 P.2d 5]; *Cole* v. *Arkansas* (1948) 333 U.S. 196, 201 [92 L.Ed. 644, 647, 68 S.Ct. 514].) Thus, in *Powell* v. *Alabama* (1932) 287 U.S. 45, 68 [77 L.Ed. 158, 170, 53 S.Ct. 55, 84 A.L.R. 527], the Supreme Court found that "it never has been doubted by this court, or any other so far as we know, that notice and hearing are preliminary steps essential to the passing of an enforceable judgment, and that they, together with a legally competent tribunal having jurisdiction of the case, constitute basic elements of the constitutional requirement of due process of law. . . . In *Holden* v. *Hardy* [ (1898) ] 169 U.S. 366, 389 [42 L.Ed. 780, 790, 18 S.Ct. 383] [for example] the necessity of due notice and an opportunity of being heard is described as among the 'immutable principles of justice which inhere in the very idea of free government which no member of the Union may disregard.' . . . Citations to the same effect might be indefinitely multiplied . . . ."

Secondly, a criminal law lacking a sufficiently ascertainable meaning precludes administration pursuant to constitutionally required procedural safeguards. The lack of ascertainable standards denies the accused a meaningful defense and prevents judicial control and review of the relevancy and sufficiency of the evidence to establish a violation of the law. (Cf. *Garner* v. *Louisiana, supra,* 368 U.S. 157, 163-164 [7 L.Ed.2d 207, 213-214]; *Thompson* v. *Louisville* (1960) 362 U.S. 199, 206 [4 L.Ed.2d 654, 659, 80 S.Ct. 624].) "The objectionable quality of vagueness [in criminal statutes affecting fundamental rights depends] upon the danger of tolerating . . . the existence of a penal statute susceptible of sweeping and improper application." (*NAACP* v. *Button, supra,* 371 U.S. 415, 432-433 [9 L.Ed.2d 405, 417-418].) Since an accused faced with a charge of violation of such a law can neither adequately prepare a defense to that charge nor protect his rights by seeking judicial review on the ground that the law was incorrectly or arbitrarily applied to him, " 'it is a fundamental rule that no citizen should be deprived of his liberty [or his life pursuant to] a law which is uncertain and am-

biguous.' [Citations.]'' (*Perez* v. *Sharp, supra*, 32 Cal.2d 711, 728; see also, *In re Oliver* (1948) 333 U.S. 257, 273, 278 [92 L.Ed. 682, 694, 696, 68 S.Ct. 499]; *Chambers* v. *Florida* (1940) 309 U.S. 227, 236-237 [84 L.Ed. 716, 721-722, 60 S.Ct. 472].)[9]

Sections 190 and 190.1 of the Penal Code contain both vices of unconstitutionally vague laws which the due process clause prohibits. First, although the offenses for which a person may suffer the death penalty are clearly prescribed, the circumstances under which a person may receive that penalty rather than life imprisonment remain totally unclear. We must assume that in establishing the alternative punishments of death and life imprisonment rather than setting down one mandatory punishment, the Legislature concluded that not all capital offenders should be punished by the extreme penalty. ''The very provision of alternatives presupposes a rational means of distinguishing between those alternatives.'' (Comment, *Scope of Appellate Review of Sentences in Capital Cases, supra*, 108 U.Pa.L.Rev. 434, 444.) Yet the current administration of the death penalty, by failing to provide criteria sufficiently ascertainable to guide courts and juries in making that distinction, prevents a convicted capital defendant from knowing how to show that he falls within the class of capital offenders for whom the law contemplates the lesser penalty of life imprisonment.

Secondly, and more crucially here, the complete absence of standards in the administration of the death penalty deprives the convicted capital defendant of any way to protect himself against an arbitrary imposition of the death penalty. Since no limitations bound the exercise of the discretion of the trier of fact, the defendant can neither challenge the evidence intro-

---

[9]'' [D]ue process requires the adjudication of an individual's rights and duties to be governed by rules of sufficient objectivity to guard against an arbitrary or *ad hominem* result. It follows that such rules, when embodied in a statute, must be definite enough to enable the judge to make rulings of law and charges to the jury which are so closely referable to the statute as to assure consistency of application.

''Due process requires, in addition, that the rules be sufficiently definite to guide the lawyer in contesting their applicability to his client. Without this latter requirement, the right to a hearing would be of little value, because there would be no adequate standards toward which arguments and evidence could be directed. Both of these requirements would seem to be satisfied by the same degree of definiteness; a statute which is sufficiently definite to guide the judge should also be sufficiently definite to guide the lawyer in litigation, because there the function of each is the same—to test application of rules to particular situations.'' (Note, *Due Process Requirements of Definiteness in Statutes* (1948) 62 Harv. L.Rev. 77-78.)

duced during the penalty trial on the ground of insufficiency nor seek review on the ground of the erroneous application of the death penalty to him. The epitome of the vice of absence of procedural safeguards inherent in vague and standardless statutes thus permeates the administration of the death penalty: the defendant sentenced to death cannot even show that an ad hoc group of 12 jurors or a judge exercising absolute power over his life abused this discretion. Sections 190 and 190.1 thus deny due process of law because they provide no standards by which an abuse of discretion by the trier of fact can be curbed or even subjected to review. The power of the trier of fact to decree the death sentence is as broad and arbitrary as it is absolute and untouchable.

The contention in Justice Burke's opinion that the trial judge's duty to redetermine the issue of penalty on the motion for a new trial by a capital defendant sentenced to death constitutes a "safeguard . . . against any possibility of arbitrary action" (*ante* p. 623) ignores the fact that the judge suffers the same lack of standards as does the jury. Since there are no criteria according to which the judge must decide the propriety of the jury's imposition of the death penalty, the capital defendant cannot know how to argue either to the trial judge that the jury has improperly applied the death penalty in his case, or to the reviewing court that the trial judge has improperly failed to reduce the penalty decreed by the jury. Far from constituting a "safeguard," the trial judge's standardless discretion to accept or reject the jury's imposition of the death penalty subjects the defendant to a two-level power of arbitrary decision.[10]

We shall now point out that the United States Supreme Court has specifically applied the due process prohibition of

---

[10]The similar suggestion in Justice Burke's opinion that the Governor's clemency power constitutes a "safeguard" against the possibility of an arbitrary imposition of the death penalty (*ante*, p. 623) likewise rests on a misunderstanding of the constitutional prohibition of laws authorizing arbitrary deprivations of fundamental rights. First, in the absence of any standards, the Governor, as well as an appellate court, cannot determine the basis, and therefore the propriety, of the trier of fact's imposition of the death penalty. Secondly, and more importantly, the clemency power is an extraordinary authority which operates outside the judicial system. (Symposium, Evolving Post-Conviction Procedures, *Executive Clemency in Capital Cases* (1964) 39 N.Y.U. L.Rev. 136, 177-178; Editorial, *Executive Clemency* (1967) 55 Cal.L.Rev. 412, 413-414.) The Governor exercises his power, not to make legal corrections within the judicial administration of the criminal law, but to alter the outcome of the judicial process on the basis of extra-legal considerations. The very character of the clemency power presupposes that the death penalty has been constitutionally applied to the condemned man.

vague and standardless statutes to the fixing of punishment and sanctions. Thus the ''void-for-vagueness'' doctrine (see generally, Note, *The Void for Vagueness Doctrine in the Supreme Court* (1960) 109 U.Pa.L.Rev. 67) cannot be limited to that portion of the criminal law which regulates and proscribes conduct. It applies equally to that part of the law which defines punishments for those who have been accused or convicted of engaging in criminal conduct. (Cf. *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 521, fn. 20 [20 L.Ed.2d 776, 785].)

In *Giaccio* v. *Pennsylvania* (1966) 382 U.S. 399 [15 L.Ed. 2d 447, 86 S.Ct. 518], the Supreme Court held that a standardless statute which authorized the jury to assess costs against acquitted defendants, and which imposed a threat of imprisonment for nonpayment of the costs, violated the due process clause of the Fourteenth Amendment. The following reasoning in *Giaccio* applies to the present administration of the death penalty.

'' [T]he 1860 Act [giving complete discretion to the jury to determine whether an acquitted defendant shall be liable for the costs of prosecution] is invalid under the Due Process Clause because of vagueness and the absence of any standards sufficient to enable defendants to protect themselves against arbitrary and discriminatory impositions of costs. . . .

''It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits *or leaves judges and jurors free to decide, without any legally fixed standards,* what is prohibited and what is not in each particular case. [Citations.] This 1860 Pennsylvania Act contains no standards at all, nor does it place any conditions of any kind upon the jury's power to impose costs upon a defendant who has been found by the jury to be not guilty of a crime charged against him. . . . *Certainly one of the basic purposes of the Due Process Clause has always been to protect a person against having the Government impose burdens upon him except in accordance with the valid laws of the land. Implicit in this constitutional safeguard is the premise that the law must be one that carries an understandable meaning with legal standards that courts must enforce.* This state Act as written does not even begin to meet this constitutional requirement.'' (Italics added.) (*Giaccio* v. *Pennsylvania, supra,* 382 U.S. 399, 402-403 [15 L.Ed.2d 447, 449-450].)

The Supreme Court exposed the constitutional infirmity in

the trial court's interpretation of the statute, expressed in its instruction, that the jury could impose costs on an acquitted defendant if it found him guilty of " 'some misconduct less than the offense which is charged but nevertheless misconduct of some kind as a result of which he should be required to pay some penalty short of conviction [and] his misconduct has given rise to the prosecution.' " Speaking for the majority Justice Black said, "It would be difficult if not impossible for a person to prepare a defense against such general abstract charges as 'misconduct' . . . If used in a *statute* which imposed forfeitures, punishments or judgments for costs, such loose and unlimiting terms would certainly cause the statute to fail to measure up to the requirements of the Due Process Clause. And these terms are no more effective to make a statute valid which standing alone is void for vagueness." (*Id.* at p. 404 [15 L.Ed.2d at p. 450].) *Giaccio* thus makes clear that the void-for-vagueness doctrine is not limited to laws regulating conduct or prescribing guilt-determination procedures, but rather applies as well to criminal statutes stipulating penalties and the procedure for their imposition.

That *Giaccio* involved an acquitted defendant does not render the decision inapposite here. The two concurring Justices, Stewart and Fortas, would have explicitly rested the decision on the narrow ground that the due process clause prohibits a state from imposing a penalty on an accused whom the jury has found not guilty of the offense charged. (*Id.* at p. 405 [15 L.Ed.2d at p. 451].) Justice Black, speaking for himself and five other Justices, however, nowhere attaches any importance to the fact of acquittal; he makes clear that the vice of the statute (and its application by the trial court pursuant to instructions formulated in terms of "misconduct") lies in its "vagueness and the absence of any standards sufficient to enable defendants to protect themselves against arbitrary and discriminatory impositions of costs." (*Id.* at p. 402 [15 L.Ed.2d at p. 449].) *Giaccio* therefore stands at least for the proposition that a jury may not be given absolute discretion to determine whether a defendant will or will not receive a specific type of penalty.

We cannot agree with the position taken in Justice Burke's opinion (see *ante*, pp. 627-628) that the Supreme Court's reference to jury discretion under indeterminate sentencing laws in footnote 8 of the opinion renders *Giaccio* inapplicable to the present issue. In footnote 8 the court states: "In so holding we intend to cast no doubt whatever on the constitu-

tionality of the settled practice of many States to leave to juries finding defendants guilty of a crime the power to fix punishment within legally prescribed limits.'' (*Id.* at p. 405 [15 L.Ed.2d at p. 451].)

First, footnote 8 demonstrates the court's recognition that the majority rationale does apply to the question of the constitutionality of jury discretion in sentencing. Second, the footnote disclaims no more than the general implication that the decision automatically renders *all* jury discretion in sentencing unconstitutional; the footnote, that is, merely states that *some* jury discretion in sentencing is consistent with the demands of the due process clause.

Finally, and most importantly, the footnote refers to those state practices leaving to the jury the discretion to fix punishment ''within legally prescribed limits.'' (*Id.* at p. 405, fn. 8 [15 L.Ed.2d at p. 451].) Footnote 8 thus relates to those sentencing procedures in which the jury performs a function similar to that performed by the Adult Authority (Pen. Code, §§ 1168, 3020-3024.5, 5075-5082) and the trial judge (e.g., Pen. Code, §§ 17, 1203) in California.[11] The purpose of footnote 8, then, was to indicate that the decision did not cast doubt upon the constitutionality of typical indeterminate sentencing procedures in which a jury—or a judge or administrative body— exercises discretion, *within legally prescribed limits,* to determine the extent of the incarceration of convicted defendants.[12]

The United States Supreme Court expressly recognized in *Witherspoon* that the penalty determination in a capital case does not constitute a typical form of sentencing discretion. *''It should be understood that much more is involved here than a simple determination of sentence.''* (Italics added.) (391 U.S. 510, 521, fn. 20 [20 L.Ed.2d 776, 785].) *Witherspoon* thus requires that we reexamine our prior decisions in *People* v. *Hill* (1967) 66 Cal.2d 536 [58 Cal.Rptr. 340, 426 P.2d 908], and *People* v. *Seiterle* (1966) 65 Cal.2d 333 [54 Cal.Rptr. 745, 420 P.2d 217]. These cases erroneously declared

[11]A minority of states leave the function of fixing punishment within the statutory limits to the jury rather than to the trial judge or an administrative body. On the jury's sentencing discretion in felony cases generally, see Note, *Statutory Structures for Sentencing Felons to Prison* (1960) 60 Colum.L.Rev. 1134, 1154-1157.

[12]We explain in the fourth part of our discussion, *infra,* that unconstitutionality of the penalty trial because of the absence of standards does not cast into doubt the constitutionality of the clearly distinguishable sentencing discretion exercised by the trial judge in California in non-capital cases.

that *Giaccio* exempted *all* forms of sentencing discretion, regardless of the nature of the choice or the penalties involved, from the holding of that case that a jury cannot constitutionally impose a penalty in the absence of standards.

III. *The absence of any prescribed standards in the administration of the death penalty deprives the capital defendant sentenced to death of his right to equal protection of the laws in violation of the Fourteenth Amendment.*

Insofar as they both interdict arbitrary laws and procedures, the equal protection and due process clauses of the Fourteenth Amendment overlap. The ''constitutional guaranties of due process and equal protection both call for procedures in criminal trials which allow no invidious discriminations between persons and different groups of persons. Both equal protection and due process emphasize the central aim of our entire judicial system—all people charged with crime must, so far as the law is concerned, 'stand on an equality before the bar of justice in every American court.' *Chambers* v. *Florida* (1940) 309 U.S. 227, 241 [84 L.Ed. 716, 724, 60 S.Ct. 472].'' (*Griffin* v. *Illinois, supra,* 351 U.S. 12, 17 [100 L.Ed. 891, 898]; *Douglas* v. *California, supra,* 372 U.S. 353, 356-358 [9 L.Ed.2d 811, 814-815]; *Truax* v. *Corrigan* (1921) 257 U.S. 312, 331-333 [66 L.Ed. 254, 262-263, 42 S.Ct. 124, 27 A.L.R. 375]; *Yick Wo* v. *Hopkins* (1886) 118 U.S. 356, 367-368 [30 L.Ed. 220, 225-226, 6 S.Ct. 1064].)

The unguided discretion of the trier of fact to decide that a convicted capital defendant shall suffer death rather than life imprisonment violates the basic guarantee of the equal protection clause that the legal process must provide for evenhanded justice. (*McLaughlin* v. *Florida* (1964) 379 U.S. 184, 194 [13 L.Ed.2d 222, 229, 85 S.Ct. 283]; *Skinner* v. *Oklahoma* (1942) 316 U.S. 535, 541 [86 L.Ed. 1655, 1660, 62 S.Ct. 1110]; *Yick Wo* v. *Hopkins, supra,* 118 U.S. 356, 369 [30 L.Ed. 220, 226].) Such discretion also violates the essential corollary of this proposition that a statute abridges this guarantee if it confers upon the jury ''a naked and arbitrary power'' to impose a criminal penalty on the basis of any principle or no principle. (*Yick Wo* v. *Hopkins, supra,* 118 U.S. at p. 366 [30 L.Ed. at p. 225].)

The equal protection clause prohibits the arbitrary selection of a class of individuals for the imposition of a special burden. It requires as a minimum that legislative classifications be rationally related to a legitimate governmental purpose. (*Loving* v. *Virginia* (1967) 388 U.S. 1, 8-9 [18

L.Ed.2d 1010, 1015-1016, 87 S.Ct. 1817] ; *Rinaldi* v. *Yeager* (1966) 384 U.S. 305, 308-309 [16 L.Ed.2d 577, 579-580, 86 S.Ct. 1497] ; *Blumenthal* v. *Board of Medical Examiners* (1962) 57 Cal.2d 228, 233 [18 Cal.Rptr. 501, 368 P.2d 101] ; *Perez* v. *Sharp, supra,* 32 Cal.2d 711, 714.) "The Constitution does not require things which are different in fact . . . to be treated in law as though they were the same" (*Tigner* v. *Texas* (1940) 310 U.S. 141, 147 [84 L.Ed. 1124, 1128, 60 S.Ct. 879, 130 A.L.R. 1321]) or prohibit "legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated." (*Barbier* v. *Connolly* (1885) 113 U.S. 27, 32 [28 L.Ed. 923, 925, 5 S.Ct. 357].) "But arbitrary selection can never be justified by calling it classification." (*Gulf, Colorado & Santa Fe Ry. Co.* v. *Ellis* (1897) 165 U.S. 150, 159 [41 L.Ed. 666, 669, 17 S.Ct. 255] ; *McLaughlin* v. *Florida, supra,* 379 U.S. 184, 190 [13 L.Ed.2d 222, 227].)

The mandate of the equal protection clause that the law "affect alike all persons similarly situated" requires that classifications imposing different treatment on selected groups of persons derive, not from whim or caprice, or hostility or favoritism towards particular individuals or groups, but from legitimate legislative objectives. (*Truax* v. *Corrigan, supra,* 257 U.S. 312, 332-333 [66 L.Ed. 254, 263] ; see generally Tussman & tenBroek, *The Equal Protection of the Laws* (1949) 37 Cal.L.Rev. 341, 344-347, 357-361.) When such a classification does not bear at least a rational relation to a legitimate legislative purpose, or when the legislation fails to reveal any legitimate purpose in relation to which the classification can be justified, then the legislation fails because it creates an "invidious discrimination." (*McLaughlin* v. *Florida, supra,* 379 U.S. 184, 190, 194 [13 L.Ed.2d 222, 227, 229] ; *Douglas* v. *California, supra,* 372 U.S. 353, 356 [9 L.Ed.2d 811, 814] ; *Skinner* v. *Oklahoma, supra,* 316 U.S. 535, 541 [86 L.Ed. 1655, 1660].)

In order to determine whether legislative classifications imposing special burdens create an invidious discrimination and thus run afoul of the equal protection clause, we must consider not only the basis of the classification and the purported justifying legislative purpose but also the nature of the legislation and the area of human conduct it regulates. (*Smith* v. *Cahoon* (1931) 283 U.S. 553, 567 [75 L.Ed. 1264, 1274, 51 S.Ct. 582] ; Tussman & tenBroek, *supra,* 37 Cal.L. Rev. 341, 372-373.) In cases involving economic regulations,

"the Court has merely asked whether there is any rational foundation for the discriminations, and has deferred to the wisdom of state legislatures." (*Loving* v. *Virginia, supra,* 388 U.S. 1, 9 [18 L.Ed.2d 1010, 1016].) But in cases in which "fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined."(*Harper* v. *Virginia Board of Elections* (1966) 383 U.S. 663, 670 [16 L.Ed.2d 169, 174, 86 S.Ct. 1079].)[13]

Thus, in *Skinner* v. *Oklahoma, supra,* 316 U.S. 535, the United States Supreme Court struck down as violative of the equal protection clause the Oklahoma Habitual Criminal Sterilization Act because it included within the class of three-time felons subject to the act those guilty of larceny but arbitrarily excluded those guilty of embezzlement. The following reasoning of the Supreme Court in *Skinner* directly applies to the question whether the state may constitutionally confer upon a jury the absolute discretion to decide that a convicted capital defendant shall be deprived of his life rather than undergo impairment of his liberty by imprisonment for life : " [I]f we had here only a question as to a State's classification of crimes, such as embezzlement or larceny, no substantial federal question would be raised. . . .

"But the instant legislation runs afoul of the equal protection clause, though we give Oklahoma that large deference which the rule of the foregoing cases requires. We are dealing here with *legislation which involves one of the basic civil rights of man . . . . There is no redemption for the individual whom the law touches.* Any experiment which the State conducts is to his irreparable injury. He is forever deprived of a basic liberty. We mention these matters . . . merely in emphasis of our view that strict scrutiny of the classification which a State makes in a sterilization law is essential, *lest unwittingly, or otherwise, invidious discriminations are made*

---

[13]A law involving a "fundamental" right (e.g., the right to vote or the right to marry) or employing a "suspect" classification (e.g., race or ancestry), "even though enacted pursuant to a valid state interest, bears a heavy burden of justification, as we have said, and will be upheld only if it is necessary, and not merely rationally related, to the accomplishment of a permissible state policy." (*McLaughlin* v. *Florida, supra,* 379 U.S. 184, 190, 196 [13 L.Ed.2d 222, 227, 231]; see also, e.g., *Loving* v. *Virginia, supra,* 388 U.S. 1 [18 L.Ed.2d 1010] (right to marry) ; *Baxstrom* v. *Herold* (1966) 383 U.S. 107 [15 L.Ed.2d 620, 86 S.Ct. 760] (right to a hearing before civil commitment at expiration of a prison sentence) ; *Cox* v. *Louisiana* (1965) 379 U.S. 536 [13 L.Ed.2d 471, 85 S.Ct. 453] (right to freedom of speech) ; *Perez* v. *Sharp, supra,* 32 Cal.2d 711 (right to marry).)

*against groups or types of individuals* in violation of the constitutional guaranty of just and equal laws. The guaranty of 'equal protection of the laws is a pledge of the protection of equal laws.' *Yick Wo* v. *Hopkins,* [*supra*] 118 U.S. 356, 369 [30 L.Ed. 220, 226]. *When the law lays an unequal hand on those who have committed intrinsically the same quality of offense* and sterilizes one and not the other, it has made as . . . *invidious a discrimination* as if it had selected a particular race or nationality for oppressive treatment." (Italics added.) (316 U.S. at pp. 540-541 [86 L.Ed. at pp. 1659-1660].)

The present administration of the death penalty in California constitutes an even more flagrant violation of the defendant's right to equal protection of the laws than the procedures under Oklahoma's Habitual Criminal Sterilization Act in *Skinner*. Here the defendant suffers not only an irreparable deprivation of his right to procreate; he suffers a deprivation of *all* "the basic civil rights of man," even life itself. Here, as in *Skinner,* we have "no redemption for the individual whom the law touches." We must therefore follow the constitutional mandate and "strictly scrutinize" the distinction which the state permits the trier of fact to draw between those convicted capital defendants who receive the death penalty and those who suffer life imprisonment, "lest unwittingly, or otherwise, invidious discriminations are made against groups or types of individuals in violation of the constitutional guaranty of just and equal laws."

The "strict scrutiny" required by *Skinner* is not necessary to reveal the inherent invidious discrimination against those capital defendants who receive the death penalty as distinguished from those who receive life imprisonment. In *Skinner,* the distinction rested on an arbitrary classification which permitted invidious discrimination; here, the distinction rests on no classification at all. In a comparable legal situation, in a case not involving the awful penalty of death but the granting of a permit to exhibit motion picture films, we very recently held an ordinance unconstitutional because it totally lacked standards. In *Burton* v. *Municipal Court* (1968) 68 Cal.2d 684, 692 [68 Cal.Rptr. 721, 441 P.2d 281], pointing to the decisions holding unconstitutional statutes and ordinances with inadequate standards, we said: "*A fortiori* an ordinance is unconstitutional *if no standards whatever* are set forth to circumscribe the discretion of officials in granting or denying licenses. [Citations.]" (Italics added.)

The procedure under sections 190 and 190.1, providing no classificatory criteria whatsoever, permits the trier of fact *arbitrarily* to determine whether particular convicted capital defendants should suffer death rather than life imprisonment. Such absence of classification renders the current procedure insufficient to satisfy even the *minimum* requirement of the equal protection clause that different treatment of persons prima facie similarly situated must bear some rational relation to a discernible legislative purpose. In failing to provide any rational basis upon which to justify an imposition of the death penalty on those particular convicted capital defendants sentenced to death rather than life imprisonment, sections 190 and 190.1 make "as . . . invidious a discrimination" against those upon whom the trier of fact imposes the death penalty "as if [they] had selected a particular race or nationality for [that] oppressive treatment." (*Skinner* v. *Oklahoma, supra,* 316 U.S. 535, 541 [86 L.Ed. 1655, 1660].) "It is clearly unconstitutional to enable a public official [let alone an ad hoc group of 12 individuals] to . . . engage in invidious discrimination among persons or groups . . . by use of a statute providing a system of broad discretionary . . . power." (*Cox* v. *Louisiana, supra,* 379 U.S. 536, 557 [13 L. Ed.2d 471, 485] ; *Yick Wo* v. *Hopkins, supra,* 118 U.S. 356, 366-368 [30 L.Ed. 220, 225-226].) Thus, the trier of fact's absolute power to impose the death penalty on a convicted capital defendant violates the basic interdictment of the equal protection clause that no person shall hold "a naked and arbitrary power" to make invidious discriminations against another. (*Yick Wo* v. *Hopkins, supra,* 118 U.S. at pp. 366-368 [30 L.Ed. 225-226].)

To meet the above propositions, Justice Burke's opinion (*Ante,* pp. 624-625) cites a number of cases from other jurisdictions which we do not find persuasive. Only two of the cases involving the lack-of-standards contention were decided after *Witherspoon* and *Jackson*: *Maxwell* v. *Bishop* (8th Cir. 1968) 398 F.2d 138, and *State of New Jersey* v. *Forcella* (1968) 52 N.J. 263 [245 A.2d 181]. The court in *Maxwell,* rejecting a constitutional challenge to the Arkansas statute, was "not convinced that the absence of expressly stated standards in the statute requires that it be forthwith condemned constitutionally. . . . [The jury's] choice between capital punishment and life imprisonment . . . is not startlingly or shockingly different from the situation where choice of punishment within statutorily prescribed limits is for the

judge.'' (398 F.2d at p. 149.) But as we shall explain in part IV, *infra,* the gravity of the decision rendered at the penalty trial as contrasted with the consequences of other sentencing decisions results in a constitutionally significant difference between these decisions.

In *Forcella* the New Jersey Supreme Court declined to overrule its earlier opinion in *State* v. *Johnson* (1961) 34 N.J. 212 [168 A.2d 1] app. dism. 368 U.S. 145 [7 L.Ed.2d 188, 82 S.Ct. 247], cert. den. 368 U.S. 933 [7 L.Ed.2d 195, 82 S.Ct. 370] (discussed *infra).* It suggested that the statute relating to the death penalty did not lend itself to ''specific standards''; that ''although the Constitution may require a standard whenever one is feasible and serviceable, it cannot follow that government must be denied all powers which defy a definitive statement of the basis of their exercise''; hence the matter must be resolved by ''a sound discretion.'' (*State of New Jersey* v. *Forcella, supra,* 245 A.2d 181, 194.) But, as we shall set out in more detail *infra,* due process requires that death not be dealt out irrationally and without standards; due process requires reasoned justice; if society or the Legislature cannot ''feasibly'' set out tests as to why one capital offender should die and the other live, the unresolved issue should not be foisted upon the trier of fact so that it inevitably must decide the issue arbitrarily. Due process can never be sacrificed upon the altar of the difficulty of its articulation; reasoned justice should not be abandoned to chance.

In another lack-of-standards case cited in Justice Burke's opinion, *Chatterton* v. *Dutton* (1967) 223 Ga. 243 [154 S.E.2d 213], cert. den. 389 U.S. 914 [19 L.Ed.2d 266, 88 S.Ct. 247], the Georgia court, in holding that the absence of standards did not deny due process to the capital defendant, merely quoted the United States Supreme Court as stating that: ''The requirements of the Fourteenth Amendment are satisfied if trial is had according to the settled course of judicial procedure obtaining in the particular State, and the laws operate on all persons alike and do not subject the individual to the arbitrary exercise of the powers of government.'' (154 S.E.2d 213, 215.) That sentence is taken out of context from *Minder* v. *Georgia* (1902) 183 U.S. 559, 562 [46 L.Ed. 328, 330, 22 S.Ct. 224]. In the latter case the defendant argued not that the manner in which the law would affect him emanated from an arbitrary and unlimited discretion, but that the state statute violated the equal protection clause because it differed from the statutes in force in other states. In dismissing the

equal protection clause contention, the *Chatterton* court merely reiterated the non sequitur that since all defendants convicted of first degree murder are subject to the same penalty procedure, the law treats alike all those within the same class.

The "reasoning" of the Georgia court in *Chatterton* begs the question by refusing to recognize that the issue is whether the class of capital offenders may be arbitrarily *sub*classified into the classes of those who do and those who do not suffer death as the penalty. Offering no logical rationale for the rejection of petitioners' Fourteenth Amendment claims, *Chatterton* cannot therefore be relied upon as authority for the proposition that a procedure which vests arbitrary power in the trier of fact to determine the question of life and death does not run afoul of the Fourteenth Amendment.

An additional federal case rejecting the lack-of-standards contention which Justice Burke's opinion cites, *In re Ernst's Petition* (1961) 294 F.2d 556, 560-561, rests upon three bases that we cannot accept. The first is its reliance upon tradition to uphold the absolute discretion of the jury in sentencing. As we explained *supra,* however, the longevity of a practice can never insulate it from constitutional scrutiny; "due process" is an evolving concept which is subjected to continuous re-analysis in light of society's development and maturation. (*Wolf* v. *Colorado* (1949) 338 U.S. 25, 27 [93 L.Ed. 1782, 1785, 69 S.Ct. 1359]; see also, *Pointer* v. *Texas* (1965) 380 U.S. 400, 403-406 [13 L.Ed.2d 923, 925-927, 85 S.Ct. 1065]; *Malloy* v. *Hogan, supra,* 378 U.S. 1, 4-6 [12 L.Ed.2d 653, 656-658]; *Gideon* v. *Wainwright* (1963) 372 U.S. 335, 339 [9 L. Ed.2d 799, 802, 83 S.Ct. 792, 93 A.L.R.2d 733]; *Rochin* v. *California* (1952) 342 U.S. 165, 168-172 [96 L.Ed. 183, 187-190, 72 S.Ct. 205, 25 A..L.R.2d 1396]; see generally, Kadish, *Methodology and Criteria in Due Process Adjudication*: *A Survey and Criticism* (1957) 66 Yale L.J. 319.)

The second basis of *Ernst* rests upon the Supreme Court's apparent prior approval of a federal penalty provision applicable to defendants convicted of first degree murder which is analogous to the provision struck down in *Jackson.* The third basis—that the delegation of discretion to the jury to decide life or death allows a mitigation of the severity of capital punishment—was explicitly rejected as a justification for an unconstitutional penalty procedure in *Jackson.*

The oldest federal case relied upon in Justice Burke's opinion, *Ex parte Sullivan* (9th Cir. 1936) 83 F.2d 796, 798,

offers us no more than the bare statement: "Appellant contends that the submission to the jury of the question whether or not the defendant, in the event he was convicted of first degree murder, should be sentenced to life imprisonment or to death was a violation of his rights under the Fourteenth Amendment to the Constitution of the United States. There is no merit in this contention." (Cf. *People* v. *Mason, supra,* 54 Cal.2d 164, 169, and other cases discussed *infra,* at fn. 14.)

*State* v. *Latham* (1962) 190 Kan. 411 [375 P.2d 788, 798-799], cited in Justice Burke's opinion, rejects the equal protection point on the ground that the question of the proper penalty must be and was resolved by the Legislature, and reads standards into a statute which literally confers complete discretion. *Latham* contains no discussion, however, of why a provision for absolute discretion in determining the penalty in capital cases *without any standards* does not subject the capital defendant to a power of unconstitutional and arbitrary decision. To answer the lack-of-standards contention in terms of the Legislature's power to delegate sentencing discretion, which ignores the question whether that discretion must be circumscribed, simply begs the issue.

Finally, *State* v. *Johnson, supra,* 168 A.2d 1, app. dism. 368 U.S. 145, cert. den. 368 U.S. 933, and *State* v. *Walters* (1958) 145 Conn. 60 [138 A.2d 786], app. dism. and cert. den. 358 U.S. 46 [3 L.Ed.2d 45, 79 S.Ct. 70], also do not support the refusal to reconsider the lack-of-standards contention. In *Johnson,* the court relied upon the existence of similar statutes in a majority of American jurisdictions, the lack of any case holding such a statute unconstitutional, and, most importantly for our consideration here, the fact that the jury's discretion to determine the death penalty was not "absolute" under the New Jersey system, although the limitation on that discretion—that the jury must act to further "the interests of justice"— was surely more apparent than real. (168 A.2d at pp. 10-11.) And in *Walters* the court also relied upon a similar provision in a federal statute conferring discretion upon the jury, and argued that for special historical reasons, not present in California, the jury was exercising the clemency power.[14]

---

[14]Similarly, the prior decisions of our court rejecting the lack-of-standards argument were all decided before *Witherspoon* and *Jackson,* and therefore their current precedential value is questionable.

The earliest case rejecting the lack-of-standards contention, *People* v. *Mason, supra,* 54 Cal.2d 164, 169, stated merely: "Defendant contends finally that it is a denial of due process of law to permit the jury to fix

The superficial discussions of these cases cannot justify our failure to reassess the lack of standards in the penalty trial in the light of well recognized constitutional principles. The

the penalty without prescribing standards to guide the exercise of its power. It is settled, however, that the selection of life imprisonment or death as the punishment for first degree murder is within the absolute discretion of the jury. (*People* v. *Green*, 47 Cal.2d 209, 232 [302 P.2d 307]; *People* v. *Friend*, 47 Cal.2d 749, 764-768 [306 P.2d 463]; *People* v. *Jones*, 52 Cal.2d 636, 652 [343 P.2d 577].)''

The three cases cited in *Mason* clearly hold that the trier of fact has absolute discretion to determine whether a defendant convicted of first degree murder shall suffer death or life imprisonment. But not one of the cases passes on the constitutionality of the administration of the death penalty in the absence of prescribed standards to guide the determination of the trier of fact.

Most recently, in *People* v. *Hill, supra,* 66 Cal.2d 536, 569, we disposed of the Fourteenth Amendment contention as follows: ''Section 190.1 places the determination of life or death within the discretion of the trier of fact. [Citations.] The jurors were fully instructed by the court as to the matters which they might consider and the valuations they were required to make in approaching the threshold of their final judgment. We have heretofore declared that section 190.1 is not unconstitutionally vague. (*People* v. *Seiterle* (1966) 65 Cal.2d 333, 340-341 [54 Cal.Rptr. 745, 420 P.2d 217]; see also *People* v. *Shipp* (1963) 59 Cal.2d 845, 853 [31 Cal.Rptr. 457, 382 P.2d 577]; *People* v. *Duncan* (1959) 51 Cal.2d 523, 529 [334 P.2d 858].)''

A review of the three cases cited by *Hill* for the proposition that we have hitherto declared constitutional the vesting of absolute discretion in the jury by sections 190 and 190.1 of the Penal Code reveals the terseness and inadequacy of the consideration which we have granted to the contentions now urged. *Seiterle,* the only case in which this court commented upon the Fourteenth Amendment ''vagueness'' ground now fully presented, fails to explain why the complete lack of standards in the present administration of the death penalty does not deprive capital defendants sentenced to death of due process of law. It rests on an incorrect interpretation of the first United States Supreme Court case (*Giaccio* v. *Pennsylvania, supra,* 382 U.S. 399) that recognizes that the ''void-for-vagueness'' doctrine applies to criminal statutes imposing penalties as well as to criminal statutes prescribing conduct sanctioned by penalties. (See discussion *supra,* p. 26 et seq.)

The discussion of the constitutional issue in *Seiterle* is limited to the following: ''Defendant argues in effect that Penal Code section 190.1 is unconstitutional because it imposes upon the trier of facts the duty of selecting the penalty without specifying any guidelines or standards to be followed. The constitutionality of section 190.1, however, has previously been upheld. (*People* v. *Shipp,* 59 Cal.2d 845, 853 [31 Cal.Rptr. 457, 382 P.2d 577]; *People* v. *Duncan,* 51 Cal.2d 523, 529 [334 P.2d 858].) *Giaccio* v. *Pennsylvania,* 382 U.S. 399 [15 L.Ed.2d 447, 86 S.Ct. 518], cited by defendant, is not contrary to the cited cases.'' (65 Cal.2d at p. 340.) The court in one sentence then gives an overly narrow statement of the holding in *Giaccio* and concludes its discussion of the constitutional issue with a citation of footnote 8 in the *Giaccio* opinion which, as we explained above, requires a diametrically opposed reading of the case.

The two cases relied upon in *Hill* and *Seiterle*—namely, *People* v. *Shipp, supra,* 59 Cal.2d 845, and *People* v. *Duncan, supra,* 51 Cal.2d 523—do not support the conclusion that the absence of any prescribed standards to delimit the trier of fact's discretion in determining the penalty does not violate the capital defendant's Fourteenth Amendment

applicability of those principles to the administration of the death penalty has become clear beyond doubt by the very recent cases of the United States Supreme Court which have obliterated the old distinction between the legal process of determining the penalty in a capital case and that of determining guilt. We cannot, by retreat into history and tradition, justify ignoring "that basic requirements of procedural fairness" (*Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 521, fn. 20 [20 L.Ed.2d 776, 785]) proscribe the imposition of the death penalty pursuant to a power of arbitrary decision.

IV. *Recognition of the unconstitutionality of sections 190 and 190.1 of the Penal Code does not affect the constitutionality of other forms of sentencing discretion in California.*

In its potential for abuse the absolute discretion conferred

rights. In *Shipp* the defendant contended that if the separate penalty trial provided for by section 190.1 cannot be waived, then the section is unconstitutional. The court merely responded: "The provisions of section 190.1 establishing the bifurcated trial are mandatory, and their constitutionality is settled. (*People* v. *Love*, 56 Cal.2d 720, 725 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809]; *People* v. *Corwin*, 52 Cal.2d 404, 407 [340 P.2d 626]; *People* v. *Duncan*, 53 Cal.2d 523, 529 [334 P.2d 858]; *People* v. *Feldkamp*, 51 Cal.2d 237, 240-241 [331 P.2d 632]; *People* v. *Ward*, 50 Cal.2d 702, 706-711 [328 P.2d 777, 76 A.L.R.2d 911]; *Ward* v. *State of California*, (9th Cir. 1959) 269 F.2d 906.)" (59 Cal.2d 845, 853.) And in *Duncan*, relied upon in *Shipp*, the court merely stated: "There is no merit in defendant's contentions that section 190.1 of the Penal Code, adopted in 1957, which provides for separate trials of the issues of guilt, penalty, and sanity, is unconstitutional. (*People* v. *Feldkamp, ante*, p. 237 [331 P.2d 632]; *People* v. *Ward*, 50 Cal.2d 702 [328 P.2d 777]; cf. *People* v. *Cordova*, 14 Cal.2d 308, 309 et seq. [94 P.2d 40].)" (51 Cal.2d 523, 529.)

None of the cases relied upon in *Shipp* and *Duncan* raised the issue of the constitutionality of conferring absolute discretion on the trier of fact to determine whether a convicted capital defendant shall suffer death or life imprisonment. In *People* v. *Love* (1961) 56 Cal.2d 720, 725 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809], the court stated only that: "Defendant contends that the trial court denied him due process by permitting the prosecutor to open and close the penalty trial and the argument to the jury. This procedure was expressly approved in *People* v. *Corwin*, 52 Cal.2d 404, 407 [340 P.2d 626]." *People* v. *Corwin* (1959) 52 Cal.2d 404 [340 P.2d 626], did not involve any constitutional attack on the administration of the death penalty. *Corwin* held that the trial court did not err in permitting the prosecutor to both open and close the argument in the penalty trial. (52 Cal.2d at p. 407.) The only constitutional issue involved in *People* v. *Feldkamp* (1958) 51 Cal.2d 237 [331 P.2d 632], *People* v. *Ward* (1958) 50 Cal.2d 702 [328 P.2d 777, 76 A.L.R.2d 911], and *Ward* v. *State of California* (9th Cir. 1959) 269 F.2d 906, was whether the application of section 190.1 to a defendant convicted of a murder committed prior to the enactment of that section violated the constitutional prohibition against ex post facto laws. Finally, the only constitutional contention urged in *People* v. *Cordova* (1939) 14 Cal.2d 308 [94 P.2d 40], related to the procedure for the determination of guilt and sanity when the defendant enters dual pleas of not guilty and not guilty by reason of insanity.

upon the trier of fact by sections 190 and 190.1 far outstrips any other form of sentencing discretion exercised under California law. As the United States Supreme Court recognized in *Witherspoon,* "much more is involved [in the trier of fact's determination whether the convicted capital defendant shall receive death or life imprisonment] than a simple determination of sentence." (391 U.S. 510, 521, fn. 20 [20 L.Ed.2d 776, 785].) Two major, and constitutionally significant, reasons explain this disparity between the discretion exercised in the death penalty trial and that exercised in other sentencing situations. The first stems from the nature and gravity of the decision rendered by the trier of fact in the penalty trial as contrasted with that of other discretionary sentencing decisions. The second arises out of the lack of any recognized purpose for establishing this standardless discretion in adjudging the death penalty as contrasted with the inherent presence of standards in the penological regime of rehabilitation that circumscribe all other forms of sentencing discretion in California.

*Skinner* v. *Oklahoma, supra,* 316 U.S. 535, holds that the constitutionally requisite safeguards to prevent abuse of discretion, and therefore the constitutionally requisite degree of specificity of standards to circumscribe the exercise of discretion, depend upon the right at stake and the irrevocability of the decision impairing that right. That the Constitution demands clear and definite legislatively prescribed standards to control the exercise of discretion to impair irrevocably the most fundamental right upon which all other rights depend, does not, therefore, necessarily imply that similar standards to control the exercise of other forms of discretion affecting less fundamental rights in a more revocable manner are constitutionally required. Hence, in determining the constitutional necessity for explicit legislatively prescribed standards to limit the exercise of delegated sentencing discretion, we must first focus upon the nature and gravity of the decision rendered by the delegatee of the sentencing discretion.

The trier of fact in the penalty trial renders the most drastic judgment a state can impose: whether to deprive a person of his life. Yet this decision lies in the absolute and unfettered discretion of the trier of fact. The trier of fact must select between two legislatively neutral alternative kinds of punishment. (See *People* v. *Green, supra,* 47 Cal.2d 209, 218.) Not even implicit principles, built into the statutory scheme, serve to guide or control this discretion. Such discretion, as

we explain below, is *sui generis*. In all other cases of sentencing discretion, in which a less fundamental right is less irrevocably affected, the law furnishes standards to guide and control the exercise of the discretion.

Thus the anomaly of the death penalty trial as it is now conducted is that it proceeds in reverse of the principle of *Skinner*. In less vital sentencing decisions, such as the determination of whether a crime should be classified as a felony or misdemeanor (see *ante*, p. 626), the statutes and the decisions set forth a purpose and policy; guidelines may be derived from such purpose and policy. But when we come to the tremendous issue of whether the capital defendant should live or die we find no purpose, policy, or basic guidelines at all. We subject the greatest penalty to administration without any safeguards but we protect the *lesser* rights by such safeguards; we thereby invert the constitutional principle of *Skinner*.

Justice Burke's opinion erroneously attempts to compare the power of the trial court to punish certain crimes as either felonies or misdemeanors with the absolute discretion conferred upon the trier of fact by sections 190 and 190.1. The nature and gravity of the two procedures significantly differ, and the sentencing discretion exercised by the trial judge in making such a decision demonstrates no similar absolute discretion unguided by legislative purpose.

The only similarity between the trial judge's power under section 17 of the Penal Code to decide that a felony "be deemed a misdemeanor for all purposes after a judgment [imposing a punishment] other than imprisonment in the state prison," and the trier of fact's power under sections 190 and 190.1, is that both involve a selection between different kinds, rather than merely varying degrees, of punishment. Since the point at which a difference in kind shades into a difference of degree always remains debatable, however, this prima facie similarity can also be as accurately described as a difference.[15] But, regardless of whether the trial judge has the power to select among kinds of punishment or only to determine degrees of deprivation of liberty, the nature and

---

[15]Imprisoment in the county jail clearly differs significantly from imprisonment in a state prison. Moreover, "when a crime is punishable by imprisonment in the state prison, or in the discretion of the court by imprisonment in the county jail, the actual punishment ordered is the test [for characterizing the crime as a felony or a misdemeanor]." (*Meyer* v. *Superior Court* (1966) 247 Cal.App.2d 133, 137 [55 Cal.Rptr. 350].) Thus the consequences of undergoing the two different penalties

purpose of the discretion he exercises, as well as the gravity of the decision he renders, demonstrate the significant differences between section 17 and sections 190 and 190.1.

First, although sections 190 and 190.1 require the trier of fact to select between two legislatively neutral alternative penalties, section 17 does not confer discretion on the trial judge to select between two such neutral alternative penalties. The Legislature does express a preference in section 17 and provides in relevant part that " 'when a crime, punishable by imprisonment in the state prison, is also punishable by fine or imprisonment in a county jail, in the discretion of the court, it shall be deemed a misdemeanor for all purposes after a judgment imposing a punishment other than imprisonment . . . in the state prison. . . .' This language has been construed uniformly to mean that the *felony aspect of the crime remains* until sentence is imposed for a misdemeanor and if no sentence is ever pronounced the offense remains a felony at all times." (Italics added.) (*People* v. *Finley* (1963) 219 Cal. App.2d 330, 340-341 [33 Cal.Rptr. 31].)[16]

Second, the trial judge in exercising the discretion conferred by section 17, like the Adult Authority in determining questions of extent of incarceration and parole (see *People* v. *Morse, supra,* 60 Cal.2d 631, 642-644; *In re Lee* (1918) 177 Cal. 690 [171 P. 958]), acts within the penological system of rehabilitation. The Legislature has not failed here, as it has with sections 190 and 190.1, to indicate its purpose in conferring discretion. This purpose, which serves to guide the exercise of the trial judge's discretion, is implicit both in section 17 itself and in the general statutory scheme of sentencing discretion.

The purpose of the trial judge's sentencing discretion under section 17 is to impose a misdemeanor sentence in those cases in which the rehabilitation of the convicted defendant either *does not require, or would be adversely affected by,*

also significantly differ. On the other hand, both obviously involve deprivations of liberty rather than of life and can therefore be described as two degrees of the same kind of punishment. And, of course, in terms of differences of severity, the two imprisonments are quite close compared to the difference faced by the convicted capital defendant.

[16]Several cases make clear that the ''legal'' sentence for a felony-misdemeanor is the felony sentence prescribed by the Legislature unless and until the trial court imposes a misdemeanor sentence. Thus, for example, the offense remains a felony for the purpose of the statute of limitations (*Doble* v. *Superior Court* (1925) 197 Cal. 556, 576-577 [241 P. 852]); when imposition of sentence is suspended the court can set the term of probation at the maximum possible felony term, and can thereafter revoke probation and pronounce a misdemeanor sentence even after expiration of the maximum misdemeanor term (*People* v. *Lippner* (1933)

incarceration in a state prison as a felon. Thus, the court in *Meyer* v. *Superior Court, supra,* 247 Cal.App.2d 133, 140, recognized that "in conferring upon the court the power [under section 17 as amended in 1963 (Stats. 1963, ch. 191, § 1, pp. 2169-2170)] to declare an offense to be a misdemeanor after it has suspended imposition of judgment or sentence, the Legislature evidently intended to enable the court to reward a convicted defendant who demonstrates by his conduct that he is rehabilitated."[17] In discussing the trial court's duty under section 17 to determine "which [sentence] is the more appropriate to a given defendant," the court in *People* v. *Smith* (1968) 259 Cal.App.2d 868, 873 [66 Cal.Rptr. 586], explained: "Modern penological thought is based upon the concept that punishment should fit the offender as well as the crime. Within the area delimited by constitutional and statutory restrictions, the sentencing judge has broad discretion to consider not only the offender's guilt, but also his potential for rehabilitation balanced against the community's need for protection."

Third, in addition to the legislative purpose of rehabilitation, the Penal Code (§§ 12, 13, and 1204) provides general procedures to guide the exercise of discretion conferred by section 17. (*People* v. *Smith, supra,* 259 Cal.App.2d 868, 872-873.) Although neither Constitution nor statute establishes a

---

219 Cal. 395, 403 [26 P.2d 457]); and in a homicide prosecution evidence that the killing was in the perpetration of an alternatively punishable offense supports a determination that the homicide was second degree murder in the perpetration of a felony. (*People* v. *Doyle* (1958) 162 Cal.App.2d 158, 161 [328 P.2d 7].)

[17]The "integral and important part in the penological plan of California . . . of the probation procedures" (*People* v. *Banks* (1959) 53 Cal.2d 370, 383 [1 Cal.Rptr. 669, 348 P.2d 102]) further evidences the mitigating and rehabilitative purposes of the trial judge's discretion under section 17. In all cases in which a defendant convicted of a felony-misdemeanor is eligible for probation, the trial court must, *before* exercising its discretion under section 17, refer the case to a probation officer and then hear and determine the suitability of probation and in connection therewith consider the report and recommendations of the probation officer. (Pen. Code, § 1203.)

"Even in a case in which the defendant is not eligible for probation, the court may in its discretion refer the matter to the probation officer for an investigation of facts relevant to sentence (Pen. Code, § 1203). In a case in which the defendant is eligible for probation, if the court renders judgment without a reference to the probation officer, the judgment will be reversed, not for a new trial, but for the purpose of proceedings in accordance with statutory procedure. [Citations.] Reference to the probation officer in cases where the defendant is ineligible for probation is provided for in section 1203, Penal Code, and it is not an idle procedure. It furnishes a record of facts relevant to punishment, . . ." (*People* v. *Gotto* (1955) 138 Cal.App.2d 165, 168 [291 P.2d 41].)

right to a full-scale hearing on the question of penalty under section 1204, the cases have uniformly construed that section to afford to a defendant the right to present evidence in mitigation of his punishment. (See, e.g., *People* v. *Valdivia* (1960) 182 Cal.App.2d 145, 148 [5 Cal.Rptr. 832] (discretion to grant or deny probation under Pen. Code, § 1203) ; *In re Klein* (1961) 197 Cal.App.2d 58, 65 [17 Cal.Rptr. 71] (discretion to sentence for a felony-misdemeanor under Pen. Code, § 17) ; *In re Miller,* 176 Cal.App.2d 75, 78-79 [1 Cal.Rptr. 62] (discretion under Pen. Code, § 17).) '' [S]ection 1204 of the Penal Code 'requires the court in determining the consequences of guilt to receive *evidence* [with the exception of the probation report provided for by section 1203] either in mitigation or aggravation of the punishment to be imposed. . . . The statute demands that the duty of determining the question of aggravation or mitigation of punishment be performed with scrupulous fairness to the defendant.' '' (*In re Miller, supra,* 176 Cal.App.2d 75, 78-79, quoting *People* v. *Neal* (1950) 97 Cal.App.2d 668, 676 [218 P.2d 556], a case involving the trial judge's discretion to sentence a defendant convicted of more than one felony either concurrently or consecutively under Penal Code section 669 ; see also *People* v. *Surplice* (1962) 203 Cal.App.2d 784, 792 [21 Cal.Rptr. 826].)

Fourth, and most important, the discretion of the trial judge under section 17, unlike that of the trier of fact under sections 190 and 190.1, is not final and ''absolute.'' The convicted and sentenced defendant may seek appellate review on the ground of ''abuse of discretion.'' (*People* v. *Smith, supra,* 259 Cal.App.2d 868, 873; *People* v. *Surplice, supra,* 203 Cal.App.2d 784, 791-792; *In re Miller, supra,* 176 Cal. App.2d 75, 78-79 [1 Cal.Rptr. 62].)

For the above reasons we submit that the type of sentencing discretion vested in the trial court by section 17 constitutes ''discretion in the legal sense of that term'' as opposed to the ''naked and arbitrary power'' (*Yick Wo* v. *Hopkins, supra,* 118 U.S. 356, 366 [30 L.Ed. 220, 225]) conferred upon the trier of fact by sections 190 and 190.1. ''Legal'' or ''judicial'' discretion ''implies absence of arbitrary determination, capricious disposition or whimsical thinking. . . . To exercise the power of judicial discretion all the material facts in evidence must be both known and considered, together also with the legal principles essential to an informed, intelligent and just decision.'' (*People* v. *Surplice, supra,* 203 Cal.App. 2d 784, 791.)

We summarize the reasons why Penal Code sections 190 and 190.1 violate due process of law. The absence of standards in the penalty trial confers absolute discretion upon the judge or jury to decree death; the capital defendant suffers death by the exercise of arbitrary power. The defendant does not know how to prepare a defense for such a trial because it lacks definable issues; this appellate court cannot intelligently review it. If the imposition of the penalty is an absolute exercise of discretion, we lack any standard of review; the judgment of death lies within the mystique of the untouchable. Indeed, in the face of the fact that "the jury must decide the question [of life or death] without benefit of guideposts, standards or applicable criteria" (*People* v. *Terry* (1964) 61 Cal.2d 137, 154 [37 Cal.Rptr. 605, 390 P.2d 381]), this court has described the speculative and illusory nature of the penalty trial and of its reviewability. We said, "To attempt to assess the effect of error in this legal vacuum is to superimpose one untestable surmise upon another. We must not pile conjecture upon conjecture and posit the decision of life or death upon a pyramid of guesses." (*Id.* at p. 154.)

In its potential for abuse the power conferred upon the trier of fact by sections 190 and 190.1 thus surpasses all other forms of sentencing discretion. The defendant sentenced to death cannot obtain judicial relief on the ground of abuse of discretion because the lack of standards in the administration of the death penalty has rendered proof of such "abuse" in this context impossible.

As the United States Supreme Court recognized in the landmark case of *Yick Wo* v. *Hopkins, supra,* 118 U.S. 356, 369-370 [30 L.Ed.2d 220, 226-227], "It is, indeed, quite true, that there must always be lodged somewhere, and in some person or body, the authority of final decision; and in many cases of mere administration the responsibility is purely political, no appeal lying except to the ultimate tribunal of the public judgment, exercised either in the pressure of opinion or by means of the suffrage. But the fundamental rights to life, liberty, and the pursuit of happiness, considered as individual possessions, are secured by those maxims of constitutional law which are the monuments showing the victorious progress of the race in securing to men the blessings of civilization under the reign of just and equal laws, . . . For, the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be

intolerable in any country where freedom prevails, as being the essence of slavery itself.''

If constitutional principle requires that standards be followed by the trier of fact in reaching its decision in all other legal proceedings, even to the matter of payment of the costs of a trial, and if the United States Supreme Court has only recently ruled that the procedure for the death penalty must be founded upon ''basic requirements of procedural fairness,'' the requirement for standards applies to Penal Code sections 190 and 190.1. To permit a judge or jury to decree a death sentence when no standard, policy, or purpose explains why one capital defendant should be spared and another executed, and thus to sanction an arbitrary taking of life, is an enormous deprivation of due process and equal protection of the laws.

Although Justice Burke's opinion assures us that the emotional amalgam of the jurors' reactions as to the penalty should be upheld as an expression of the ''conscience of the community,'' the rhetoric hardly obscures the reality. That there is no ''conscience of the community'' which can distinguish between those capital defendants who should suffer the death penalty and those who should be spared finds graphic illustration in the in-depth statistical study of Hans Zeisel, ''Some Data on Juror Attitudes Towards Capital Punishment'' (1968) Center for Studies in Criminal Justice, University of Chicago Law School. After demonstrating that he can find no decisive factors which account for the infliction of the penalty, Zeisel concludes: ''In the end the task is one of deciding who, among those convicted of capital crimes, is to die. Whatever the differences on which this decision hinges, they remain demeaningly trivial compared to the stakes. *The discretionary use of the death penalty requires a decision which no human should be called upon to make.*'' (Fn. omitted.) (Italics added.)[18]

Sections 190 and 190.1 permit the judge or jury to decree the random doom of death without the restraining guide of reason. Neither society nor the Legislature nor the courts have said why one capital defendant should be selected to die and

[18]Zeisel's empirical study accords with the point made by Professor Wechsler: ''A discretionary system . . . becomes inevitable with equally inevitable differences in judgment depending on the individuals involved and other accidents of time and place. Yet most dramatically when life is at stake, equality is . . . a most important element of justice.'' (Symposium on Capital Punishment (1961) N.Y.L.F., vol. 7, pp. 250, 259.)

another to live. The death penalty has been supported as a punishment, a deterrent, a safety valve for revenge, an economy for the state, and on other grounds, each of which has been as hotly defended as it has been severely attacked. But no one knows which of these notions, and as many others as the mind can conjure, are accidentally seized upon by judge or jury to grant or deny life. No one knows what moves judge or jury to select a capital defendant for death. We know only that the motives and notions that deal out death are as obscure, disordered, and irrational as the statistical incidence of the death penalty itself. (Sellin, Capital Punishment (1967) 202; Kalven & Zeisel, The American Jury (1966) 436-444.) Yet the foundation rock of the law is reason; the judicial process presupposes "that its determinations are justified only when explained or explainable in reason." (Breitel, *The Law Makers* (1965) 65 Colum.L.Rev. 749, 772.)

The irrational process of decreeing death cannot be reconciled with a sense of reasoned justice; we cannot explain why or when we impose the penalty. If a civilized society cannot say why one man should be executed and another not, it does not rationally, logically, take life. Instead, it grossly denies due process of law in inflicting death upon the basis of a trial that is capricious, discriminatory, and guess-infested.

I therefore dissent from the court's ruling on the constitutionality of the death penalty, but concur in the opinion on the other issues.

Traynor, C. J., and Peters, J., concurred.

McCOMB, J.—For all the reasons set forth in Mr. Justice Burke's opinion, I concur in the decision of the majority of this court that the death penalty is constitutional and does not constitute cruel or unusual punishment, that Penal Code sections 190 and 190.1 are valid, and that petitioners will be afforded the services of counsel in the proceedings specified in Mr. Justice Burke's opinion. I respectfully dissent from that portion thereof that sets aside the death penalties under the compulsion of *Witherspoon* v. *Illinois*, 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770].

The circumstances that influenced the United States Supreme Court to conclude that the *Witherspoon* jury "fell woefully short of that impartiality to which the petitioner was entitled under the Sixth and Fourteenth Amendments" (391 U.S. at p. 518 [20 L.Ed.2d at p. 783, 88 S.Ct. at p. 1775]) did not exist in the two cases before us.

The jury that fixed the penalty at death in *Saterfield* was composed of 12 men and women, each of whom, on *voir dire* examination by defendant through his counsel, solemnly swore that he had no preference for one penalty over another or had no preconceived notion that one was more appropriate than the other. The record shows:

Juror Shaver: "Q. And as I have indicated you may be called on to decide the question of penalty. Do you have any feelings that one penalty is more appropriate than the other? A. No, sir, I don't think so."

Juror Kavanaugh. "Q. And if the question of penalty is put up to you, do you have any, start—at this point, we will put it that way, with any feelings one penalty is to be preferred over the other? A. No. Q. Do you feel that the facts of the case should determine, perhaps, what penalty is imposed? A. That is right. Q. If that question [penalty] reaches you? A. Yes."

Juror Allis. "Q. Any feeling, if that question of penalty is submitted to you, any feeling that one is to be preferred over the other? A. (Juror indicates negatively.) Q. One is more appropriate than the other? A. No."

Juror Wehrs. "Q. Do you have any feeling that there are— at least awareness of any feeling that anyone who takes a human life should give his life in exchange? A. Do I have any what? Q. In other words, do you feel that anyone who kills another person should be executed? A. Based on the evidence and the instructions I received, I would make my determination from that. Q. But you have no feeling at this point? A. No preconceived feeling, no."

Juror Reynolds. "Q. If the circumstances, or the question of penalty is submitted to you, do you, at this time, have any feelings as to whether the death penalty or life imprisonment is more appropriate? A. No. Q. It is a question of the facts presented to you? A. Yes."

Juror Leasure. This juror was not specifically asked if she had any feeling that one penalty was more appropriate than another, but defense counsel asked: "Q. Mrs. Leasure, I presume you were able to hear my questions? A. Yes. Q. Any of them you feel calls for comment, as far as you were concerned? A. No."

Juror Pulliam. "Q. Do you have any feelings, at the moment, one penalty or the other is more appropriate? A. No."

Juror Hilburn. "Q. And as has also been indicated to you, it may evolve upon you to decide penalty in this case; do you

have any feeling one penalty is more appropriate than the other at this time? A. No, sir."

Juror Georges. "Q. Do you have any particular feelings that, assuming the question of penalty is ever submitted to you, that one penalty is more appropriate than the other? A. No, sir."

Juror Hall. "Q. Do you have any particular feelings, if the question of penalty is ultimately submitted to you, as to what penalty is most appropriate? A. No, I don't at this time. I'd have to hear the evidence."

Alternate Juror Moss. "Q. Do you have any feelings that if the question of penalty is submitted to you, do you have any feelings, at the moment, one penalty would be more appropriate than the other? A. No."

Alternate Juror Moore. "Q. Do you have any particular feeling one penalty is more appropriate than another? A. No. Depends on the case, of course."

I do not understand how the above jurors can, by any definition, be said to be jurors "uncommonly willing to condemn a man to die." (391 U.S. at p. 521 [20 L.Ed.2d at p. 784, 88 S.Ct. at p. 1776].)

While the questions propounded by the defense to the *Anderson* jurors were not so precisely worded as in *Saterfield*, it is clear to me that, unlike *Witherspoon* (where "In its quest for a jury capable of imposing the death penalty, the State produced a jury uncommonly willing to condemn a man to die" (*ibid.*) the State of California was in search of a jury that was capable of imposing either one of the alternative penalties provided by state law based on which penalty the individual juror believed was justified. A typical question asked of prospective jurors by the prosecution time after time was, in substance: "If you felt that the merits of this case were consistent with what you would require in a proper case, you would have no hesitancy in returning the death penalty? [Answer.] And by the same token, if you felt the case on its merits didn't measure up to that which you felt was a proper case for the death penalty, you would have no hesitancy in returning a verdict of life imprisonment, is that correct? [Answer.]" Sometimes the questions were stated in reverse order: "If you felt that the case warranted the returning of life imprisonment, you would return such a verdict, is that correct? [Answer.] And on the other hand, if you felt the case justified the death penalty, I take it you'd return such a verdict? [Answer.]"

Again unlike *Witherspoon,* the State of California did not "entrust the determination of whether a man shall live or die to a tribunal organized to return a verdict of death." (391 U.S. at p. 521 [20 L.Ed.2d at p. 784, 88 S.Ct. at p. 1776].)

*Witherspoon* tells us that an acceptable impartial juror is one who will "be willing to *consider* all of the penalties provided by state law, and . . . not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." (391 U.S. at p. 522 [20 L.Ed.2d at p. 785, 88 S.Ct. at p. 1777, fn. 21].) Yet, a jury, as a body, (who must return a unanimous verdict) does not represent a cross-section of the community and is, ipso facto, not an impartial jury, unless it is composed of some individual jurors who "harbor doubts about the wisdom of capital punishment" or who "would be reluctant to pronounce the extreme penalty." (391 U.S. at p. 520 [20 L.Ed.2d at p. 784, 88 S.Ct. at p. 1776].) These differing qualifications for an impartial individual juror and an impartial jury as a body are beyond comprehension, as 12 impartial jurors should add up to one impartial jury. Regardless of the arithmetic involved, for reasons not in issue in *Witherspoon,* that case does not, in my opinion compel setting aside the death penalties in our cases.

The majority say that they cannot conjecture that the prosecutor would have used his peremptory challenges to exclude jurors who were excused for cause by the court on its own motion. It is entirely reasonable that the People would have done so. In *Saterfield,* the People exercised only 2 of its 20 peremptory challenges in the selection of the 12 regular jurors and only one peremptory challenge in the selection of 4 alternates. In *Anderson,* the People used only 9 of its 20 peremptory challenges. Since none of the alternates served in *Anderson,* the manner of their selection is of no consequence. The defense was satisfied with the jury after the exercise of 10 peremptory challenges in *Saterfield* and 8 in *Anderson*

*Witherspoon* speaks only of veniremen improperly excused for cause and repeatedly criticizes the State of Illinois for having excused *all* veniremen who harbored doubts about the wisdom of capital punishment or *all* who said they did not believe in, or were opposed to, capital punishment. There is nothing in the opinion that compels the conclusion that the death penalty would have been set aside had some lesser number been improperly excused. As the majority of this court

point out, the *Witherspoon* court did not discuss the effect of the existence of remaining peremptory challenges of the prosecution. That issue was not before them.

Mr. Chief Justice Weintraub, speaking for the New Jersey Supreme Court in *State* v. *Mathis*, 52 N.J. 238 [245 A.2d 20], has taken the correct approach to the problem of jury selection and/or exclusion in conformity with the *Witherspoon* rule: "The thesis of *Witherspoon* is that persons who dislike capital punishment but are nonetheless capable of weighing the penalty issue constitute a segment of the community within the concept that a jury shall be drawn from a cross-section of the community. The erroneous exclusion of some jurors does not mean that the balance of the jury list was thereby deprived of representatives of that segment. Nor would it matter if no member of that segment in fact was selected. A defendant's right is to a fair opportunity to draw from all relevant segments, and unless the erroneous rulings amounted to a denial of that opportunity, the constitutional right was not infringed. To hold otherwise would burden the judicial process with no demonstrable justification. And we think it correct to add that if the prosecution did not use all its peremptory challenges, that fact may be a relevant make-weight, for it is not unreasonable to assume that the remaining challenges would have been used, had the trial court ruled against the State on its objection to a specific juror. Here the State used only 7 of its 12 peremptory challenges." (P. 27.)

I would deny the writs.

On December 11, 1968, the opinion was modified to read as printed above. Petitioners' application for a rehearing was denied December 18, 1968.